Patricio HERNANDEZ–CORDERO and Maria Guadalupe Ortega de Hernandez, Petitioners,

v.

UNITED STATES IMMIGRATION & NATURALIZATION SERVICE, Respondent.

No. 85–4587.

United States Court of Appeals, Fifth Circuit.

June 19, 1987.

Barbara Hines, Austin, Tex., for petitioners.

Lawrence H. Rudnick, Philadelphia, Pa., for amicus curiae AM Immigration.

James M. Spears, Edwin Meese, III, Atty. Gen., Dept. of Justice, Robert L. Bombaugh, Director, Office of Immigration Litigation, Civ. Div., Allen W. Hausman, Asst. Director, Madelyn E. Johnson, Eloise Rosas, Richard M. Evans, Lauri Steven Filppu, Marshall Tamor Golding, Attys., Washington, D.C., for I.N.S.

Richard M. Casillas, Dist. Director, San Antonio, Tex., David H. Lambert, Dist. Director, I.N.S., New Orleans, La., for other interested parties.

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL and JONES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Patricio Hernandez-Cordero and his wife, Maria Guadalupe Ortega de Hernandez, appeal the denial of their application for a suspension of deportation. 8 U.S.C. § 1254(a)(1). We affirm.

## I.

Mr. and Mrs. Hernandez are citizens of the Republic of Mexico. They have resided in the United States continuously since they were married in 1975. Mr. Hernandez is a self-employed trim-carpenter contractor and earns approximately $12,000 per year. Mrs. Hernandez is a housewife. The Hernandezes' assets are valued at approximately $70,000.

The Hernandezes have four children: Victor, age 14, Patricio Jr., age 11, Lisa, age 9 and Veronica, age 8. Victor is a Mexican citizen; the three youngest children are American citizens.

Mr. Hernandez is subject to deportation because he has never obtained a visa. 8 U.S.C. § 1251(a)(1). Although Mrs. Hernandez obtained a visitor's permit upon her entry to the United States, she is also subject to deportation because she did not depart when it expired. 8 U.S.C. § 1251(a)(2).

Mr. and Mrs. Hernandez applied for a suspension of deportation and contended that they were eligible for discretionary relief because deportation would cause them "extreme hardship." See 8 U.S.C. § 1254(a)(1). The Hernandezes argued that deportation would cause economic hardship because they would be forced to sell their newly-bought home at a loss and would have difficulty finding work in Mexico. The evidence of economic hardship was supported by an affidavit from an economist who specializes in Latin America. The Hernandezes also argued that deportation would cause emotional and psychological hardship because they would be uprooted from the community to which they had grown accustomed. An affidavit was submitted from a licensed psychologist detailing the emotional difficulties the Hernandez family would likely suffer if deported. Six teachers also submitted affidavits regarding the diminished educational opportunity available in Mexico and the adverse impact this would likely have on the Hernandez children.

After evaluating all of the evidence, the immigration judge denied the application for a suspension of deportation. Although the immigration judge found that deportation would cause hardship for Mr. and Mrs. Hernandez and their children, he found that the hardship was not "extreme." The immigration judge recognized the economic hardship of selling a newly-bought home at a loss, but concluded that this was a "self-inflicted wound" because the house was built several months after deportation proceedings commenced. The immigration judge also recognized that the employment

opportunities in Mexico are not as favorable as those in the United States, but noted that it is well-established that economic hardship alone cannot constitute "extreme hardship." *See, e.g., Zamora-Garcia v. INS*, 737 F.2d 488, 491 (5th Cir.1984). Even considering the combined effect of economic hardship with the other potential hardship factors, the immigration judge found that the hardship was not "extreme." The Hernandezes are young, healthy and have significant family ties in Mexico where their parents and most of their brothers and sisters reside. The immigration judge specifically found that deportation would not cause "extreme hardship" to any of the three American citizen children who, notably, are bilingual.

The Board of Immigration Appeals (BIA) upheld the denial of the application for a suspension of deportation. The BIA evaluated all of the alleged hardships that deportation would cause for the Hernandez family, including the financial hardship, the difficulties of adjusting to life in Mexico, and the educational burden on the children. In affirming the immigration judge's determination that deportation would not cause "extreme hardship," the BIA expressly stated that it had "considered all of the factors presented, both individually and cumulatively."

Mr. and Mrs. Hernandez brought the instant appeal, arguing that the BIA abused its discretion in denying the application for a suspension of deportation. A panel of this court agreed and reversed the BIA, finding that "the mere recitation that all of the factors were considered cumulatively is not sufficient." *Hernandez-Cordero v. INS*, 783 F.2d 1266, 1269 (5th Cir.1986). For the reasons that follow, we affirm the determination of the BIA.

## II.

Section 244(a)(1) of the Immigration and Nationality Act creates a two-tiered statutory framework for suspension of deportation. 8 U.S.C. § 1254(a)(1). First, eligibility for a suspension of deportation is only available to an alien who: (1) has been physically present in the United States for a continuous period of at least seven years immediately preceding the application; (2) is a person of good moral character; and (3) is a person whose deportation would, "in the opinion of the Attorney General," result in "extreme hardship" to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence. 8 U.S.C. § 1254(a)(1). The burden is on the alien to establish his eligibility for a suspension of deportation. *Gomez-Martinez v. INS*, 593 F.2d 10 (5th Cir.), *cert. denied*, 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1979).

Second, even if these eligibility requirements are satisfied, the Attorney General retains the discretion to suspend, or refuse to suspend, deportation. *INS v. Rios-Pineda*, 471 U.S. 444, 446, 105 S.Ct. 2098, 2100, 85 L.Ed.2d 452 (1985). As a corollary to this ultimate discretion to deny relief to an otherwise eligible alien, the Supreme Court has explained that "if the Attorney General decides that relief should be denied as a matter of discretion, he need not consider whether the threshold statutory eligibility requirements are met." *Id.* at 2102.

The standard of review varies depending on which aspect of the statutory scheme is at issue. Under the first tier, we review the BIA's findings of continuous residency and good moral character under the "substantial evidence" test. *Zamora-Garcia*, 737 F.2d at 490. A BIA finding regarding the "extreme hardship" requirement is reviewed under the more limited "abuse of discretion" standard. *Id.*

The standard of review is exceedingly narrow for the Attorney General's ultimate decision under the second tier of the statute. *See Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977); *Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). The Attorney General enjoys "unfettered" discretion to decide whether to suspend the deportation of an alien. *Jay v. Boyd*, 351 U.S. 345, 354, 76 S.Ct. 919, 924, 100 L.Ed. 1242 (1956). It has been said that the ultimate decision whether to suspend de-

portation "is a matter of grace," similar to a Presidential pardon. *United States ex rel. Kaloudis v. Shaughnessy,* 180 F.2d 489, 491 (2d Cir.1950) (L. Hand). *See also, United States ex rel. Hintopoulos v. Shaughnessy,* 353 U.S. 72, 77, 77 S.Ct. 618, 621, 1 L.Ed.2d 652 (1957). Judicial review of such a highly discretionary decision is strictly limited because the subject is uniquely within the competence and power of the political branches. *See Fiallo v. Bell,* 430 U.S. at 792, 97 S.Ct. at 1477; *Mathews v. Diaz,* 426 U.S. at 81–82, 96 S.Ct. at 1892.

The Attorney General's power under the Act has been delegated to the Commissioner of Immigration and Naturalization who in turn has redelegated the authority to specified INS personnel. 8 C.F.R. § 2.1. The specific power to rule on applications for suspensions of deportation has been delegated to immigration judges,[1] 8 C.F.R. § 242.8, whose decisions are subject to review by the BIA. 8 C.F.R. § 242.21. The BIA's authority similarly derives from the Attorney General. 8 C.F.R. §§ 3.0, 3.1.

In the instant case, Mr. and Mrs. Hernandez challenge the BIA's determination under the first tier of the statute that, "in the opinion of the Attorney General," deportation would not cause "extreme hardship." The INS has stipulated that Mr. and Mrs. Hernandez have good moral character and satisfy the seven year residency requirement.

The Hernandezes' argument on appeal is twofold. First, they seek substantive review of the BIA's narrow definition of "extreme hardship." Second, they seek procedural review of the BIA's alleged failure to analyze the relevant hardship factors both individually and cumulatively. We reject both of these arguments in turn.

### III.

The Supreme Court has recognized the broad discretion of the BIA to narrowly define "extreme hardship." *INS v. Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981). In *Wang,* a Korean family alleged that deportation would result in "extreme hardship" to their two American born children because neither child spoke Korean. *Id.* at 142, 101 S.Ct. at 1030. Although the BIA found that the family had failed to demonstrate a prima facie case of "extreme hardship," the Ninth Circuit disagreed, reasoning that the statute should be liberally construed. *Id.* at 143, 101 S.Ct. at 1030. The Supreme Court reversed and held that the Ninth Circuit had "improvidently encroached on the authority which the Act confers on the Attorney General and his delegates." *Id.* at 144, 101 S.Ct. at 1031. The Court explained that "the Act commits [the] definition [of extreme hardship] in the first instance to the Attorney General and his delegates, and their construction and application of this standard should not be overturned by a reviewing court simply because it may prefer another interpretation of the statute." *Id.* at 144, 101 S.Ct. at 1031. The Court emphasized that:

> The Attorney General and his delegates have the authority to construe "extreme hardship" narrowly should they deem it wise to do so. Such a narrow interpretation is consistent with the "extreme hardship" language, which itself indicates the exceptional nature of the suspension remedy.

*Id.* at 145, 101 S.Ct. at 1031.

In a series of post-*Wang* decisions, we have consistently adhered to a limited standard of review over the BIA's authority to define "extreme hardship" and deny eligibility for a suspension of relief. See, e.g., *Ganjour v. INS,* 796 F.2d 832, 839 (5th Cir.1986); *Zamora-Garcia,* 737 F.2d at 490; *Ramos v. INS,* 695 F.2d 181, 185 (5th Cir. 1983). Although we often state the standard of review of this determination by the BIA as an "abuse of discretion" standard, *Zamora-Garcia,* 737 F.2d at 490, those terms do not fully convey the extent to which deference is due in reviewing the substance of the BIA's determination that

---

1. Although the regulations state that the power is delegated to "special inquiry officers," 8 C.F.R. § 242.8, that term is used interchange-ably with the title "immigration judge." 8 C.F.R. § 1.1.

the hardship is not "extreme." Our latitude to review the BIA's determination of "extreme hardship" by the "abuse of discretion" standard depends on the scope of the BIA's discretion in the first instance. *Osuchukwu v. INS*, 744 F.2d 1136, 1142 (5th Cir.1984). In evaluating the extent of the BIA's discretionary authority, we have previously stated that:

> In view of *Wang*'s language concerning the authority of the Attorney General to define "extreme hardship" and to construe it narrowly, we doubt that there remains much, if any, scope for judicial *substantive* review, even under an "abuse of discretion" standard, of no "extreme hardship" determinations.

*Ramos*, 695 F.2d at 185 (emphasis in original).

■ Substantive review of a no "extreme hardship" determination is strictly limited for two interrelated reasons. First, the statute expressly qualifies the definition of "extreme hardship" as being "in the opinion of the Attorney General." 8 U.S.C. § 1254(a)(1). The BIA, as the Attorney General's delegate, is therefore empowered to decide what constitutes "extreme hardship" and to apply that standard to each individual case. 8 U.S.C. § 1103; 8 C.F.R. § 2.1. *See also Wang*, 450 U.S. at 140, 101 S.Ct. at 1029. Second, the statute declares that the hardship must be "extreme," a highly subjective standard that is difficult, if not impossible, to review. The BIA is therefore doubly-insulated from substantive review of a finding of no "extreme hardship": it is not only empowered to formulate its own opinion of what is "extreme," but to utilize that opinion to define a highly subjective term.[2]

The nature of the two-tiered statutory scheme designed by Congress bolsters our view that substantive review of a no "extreme hardship" determination is strictly limited. We read the Attorney General's express Congressional authority to use his "opinion" to define "extreme hardship," 8 U.S.C. § 1254(a)(1), as similar to the Attorney General's express Congressional authority to use his "discretion" to determine whether to ultimately suspend deportation. 8 U.S.C. § 1254(a). The Supreme Court has defined the latter as "unfettered" discretion, *Jay v. Boyd*, 351 U.S. at 354, 76 S.Ct. at 925, and we see no reason why the Attorney General's discretion to determine extreme hardship should not be equally unfettered. By creating a two-tiered system of discretion, Congress intended the threshold criteria to "restrict the opportunity for discretionary" relief, not expand it. *INS v. Phinpathya*, 464 U.S. 183, 104 S.Ct. 584, 592, 78 L.Ed.2d 401. The Congressional intent was to limit the number of aliens eligible for discretionary relief; it was not meant to increase the number of eligible aliens only to have the Attorney General use his "unfettered" discretion to ultimately deny relief.[3] After all, the Attorney General may freely pretermit the eligibility factors and deny a suspension of deportation, subject to virtually no substantive review. *INS v. Rios-Pineda*, 105 S.Ct. at 2100.

■ In sum, the language of the statute, the historical nature of the remedy of suspension of deportation and the holdings of the Supreme Court, our court and other circuit courts leads us to conclude that a court has an exceedingly narrow substantive review of the BIA's determination of no "extreme hardship."[4] We are per-

---

**2.** The dissent asserts that our analysis conflicts with previous interpretations of the phrase "in the opinion of" which utilized a more rigorous standard of review than we use here. But in this case, unlike the cases cited by the dissent, the Attorney General's authority is doubly-insulated from judicial review: he is directed to formulate his opinion as to what constitutes "extreme" hardship. None of the cases cited by the dissent involves statutes that authorize the formulation of an opinion about the definition of such a highly subjective term.

**3.** The fact that Congress has reserved for itself the right to veto a grant of discretionary relief, but not a denial, is further evidence that Congress meant to narrow the availability of the relief, not expand it. *See* 8 U.S.C. § 1254(c).

**4.** The authorities do not support the argument that less deference is due the Attorney General's opinion if the opinion is reached by the Attorney General's delegate rather than the Attorney General personally.

In *INS v. Bagamasbad*, 429 U.S. 24, 25, 97 S.Ct. 200, 201, 50 L.Ed.2d 190 (1976), the Su-

suaded that in the substantive review of a no "extreme hardship" determination, we are entitled to find that the BIA abused its discretion only in a case where the hardship is uniquely extreme, at or closely approaching the outer limits of the most severe hardship the alien could suffer and so severe that any reasonable person would necessarily conclude that the hardship is extreme. Measured against this standard, the DIA did not abuse its discretion in finding that the hardship facing the Hernandezes in Mexico was not "extreme."

## IV.

Although a court has virtually no substantive review of the BIA's "extreme hardship" finding, we may still scrutinize the BIA's decision for procedural regularity. We recently clarified that this procedural review "is limited to ascertaining whether *any* consideration has been given" by the BIA to the factors establishing "extreme hardship." *Sanchez v. INS*, 755 F.2d 1158, 1160 (5th Cir.1985) (emphasis in original). In *Sanchez* we affirmed the denial of a suspension of deportation because the BIA did not "utterly fail" to give consideration to the factors pertinent to a determination of "extreme hardship." *Id.* We reasoned that a procedural review that focuses on whether the petitioner's claims of hardship have been adequately considered should be strictly limited because "we ... lack the authority to determine the weight, if any, to be afforded each factor." *Id.* at 1160.

■ The BIA will ordinarily satisfy its procedural responsibilities by demonstrating that it has considered all the relevant factors of an "extreme hardship" determination, both individually and collectively. *Luciano-Vincente v. INS*, 786 F.2d 706, 708–09 (5th Cir.1986); *Ganjour v. INS*, 796 F.2d 832, 840 (5th Cir.1986). "It has no

duty to write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Osuchukwu v. INS*, 744 F.2d at 1142–43.

■ Both the immigration judge and the BIA considered all of the relevant hardship factors in this case, and they both concluded that they were not "extreme." The BIA specifically stated that it "considered all of the factors presented, both individually and cumulatively." Although the panel opinion was critical of the BIA's lack of analysis on the cumulative effect of the Hernandezes' individual claims of hardship, we see little else on this record the BIA could have said on the subject. Petitioner points to no independent factor created by the synergistic effect of the combination of hardship claims that requires separate consideration and discussion. The BIA therefore did not "utterly fail" to consider the relevant hardship factors. *Sanchez*, 755 F.2d at 1160. On the contrary, the BIA analyzed each factor and then concluded that even when analyzed cumulatively, the hardship was not "extreme."

## V.

■ The question in this case is not whether the Hernandezes are honest, dependable, hardworking members of society. They clearly are. Any of us would be happy to see them gain citizenship. But Congress in its wisdom has determined that this is not enough to avoid deportation under 8 U.S.C. § 1254(a)(1). To be eligible for this discretionary relief, aliens with the highest character and strictest work ethic must also establish that they will "in the opinion of the Attorney General" suffer "extreme hardship" if deported. Thus the

preme Court upheld the Attorney General's ultimate authority to deny a suspension of deportation. The opinion in *Bagamasbad* makes it clear that the initial discretion to deny a suspension of deportation was exercised by an immigration judge and that this determination was affirmed by the BIA. Even though the initial decision to deny a suspension of deportation in *Bagamasbad* was made by the Attorney General's delegates, and not by the Attorney General

himself, the Court did not alter the rule that the ultimate decision to deny a suspension of deportation is to be accorded "unfettered discretion." See *Jay v. Boyd*, 351 U.S. at 354, 76 S.Ct. at 925. Similarly in the instant case, we see no reason why the determination of no "extreme hardship" should be accorded less deference merely because the initial decision was made by the Attorney General's delegates, and not by the Attorney General himself.

only issue in this case is whether the record demonstrates that the BIA, as the Attorney General's delegate, abused its discretion in finding that the Hernandezes will not suffer "extreme hardship" if deported to Mexico. The record in this case simply does not reveal such an abuse of discretion. Indeed, we would expect any hardworking aliens who are deported to an economically deprived country after enjoying a high standard of living in this country for seven years to suffer hardship similar to that demonstrated by the Hernandezes. In short, we see no unique hardship or unusually severe hardship that the Hernandezes will suffer if they are deported to Mexico that approaches the level of hardship required to compel a finding of "extreme hardship" by the BIA.

Accordingly, the order of the BIA denying the application for a suspension of deportation is

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, with whom POLITZ, JOHNSON, JERRE S. WILLIAMS and EDITH H. JONES, Circuit Judges join, dissenting:

The majority opinion professes to adhere to the statutory mandate that federal courts review decisions made by subordinate government officials, but in fact the opinion adopts a standard of review that renders administrative decisionmaking unreviewable. The court thus abandons these "honest, dependable, hardworking members of society" to the indifference of the bureaucracy. While Congress has ordered relief for aliens whose deportation would subject them or their children to extreme hardship, the only hardship that the majority deem sufficiently severe to be "extreme" must be *"uniquely* extreme, at or closely approaching the *outer* limits of the *most severe hardship* an alien *could* suffer *AND so severe that ANY reasonable person would NECESSARILY conclude that the hardship is extreme."* (Emphasis added.) This interpretation strips the phrase "extreme hardship" of virtually all content and abdicates our responsibility under the Administrative Procedure Act to assure against arbitrary and capricious administrative action. I therefore respectfully dissent.

## I.

As the Supreme Court held in *Bowen v. Michigan Academy of Family Physicians*,[1] "[w]e begin with the strong presumption that Congress intends judicial review of administrative action."[2] *Bowen* reminds us that it has been the policy of Congress to avoid "blank checks drawn to the credit of some administrative officer or board."[3] Justice Potter Stewart observed for the Court in *Rusk v. Cort*[4] that only upon a showing of "clear and convincing evidence that Congress so intended" should the courts restrict access to judicial review. And, as the Court concluded in *Bowen*, "[w]e ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command."[5]

Even discretionary actions are reviewable for abuse of the discretion imparted, for discretion is to be soundly exercised and is not a license for fiat.[6] In the words of James Madison, "You must first enable

---

**1.** —— U.S. ——, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

**2.** *Id.* at ——, 106 S.Ct. at 2135. *See also* Ludd, *Administrative Discretion and the Immigration and Naturalization Service: To Review or Not to Review?*, 8 Thurgood Marshall L.Rev. 65, 65 (1983).

**3.** *Id.* at ——, 106 S.Ct. at 2136 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)).

**4.** 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962).

**5.** *Id.* at ——, 106 S.Ct. at 2141.

**6.** *See Foti v. INS,* 375 U.S. 217, 228–29, 84 S.Ct. 306, 313–14, 11 L.Ed.2d 281 (1963); *United States ex rel. Hintopoulos v. Shaughnessy,* 353 U.S. 72, 77, 77 S.Ct. 618, 621, 1 L.Ed.2d 652 (1957); *Wong Wing Hang v. INS,* 360 F.2d 715, 718 (2d Cir.1966). *But see Jay v. Boyd,* 351 U.S. 345, 354–55, 76 S.Ct. 919, 924–25, 100 L.Ed. 1242 (1956).

the government to control the governed; and in the next place oblige it to control itself." Congress has reposed in the circuit courts the responsibility for obliging administrative agencies to control themselves and to adhere to their congressional mandate. The Administrative Procedure Act instructs us: "[T]he reviewing court shall decide, all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court *shall*— ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [7] The Supreme Court has equated this with our responsibility to determine whether "there has been a clear error of judgment." [8] Review is meaningless if it is circumscribed by a standard that assures but one result.

The provisions of section 244 of the Immigration and Nationality Act [9] are designed to ameliorate the plight of aliens who would otherwise be subject to deportation. Part (a) of this section provides: "[T]he Attorney General may, in his discretion, suspend deportation" and adjust an alien's status to that of one "lawfully admitted," if the alien

> has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of [his application for suspension], and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, *in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States....* [10]

Congress did not by this language vest the Attorney General or his subordinates with "ad hoc discretion" to be exercised at the whim of the decisionmaker. Congress undoubtedly delegated discretion to the Attorney General to determine in the first instance what is extreme hardship. [11] The majority ultimately agree that this discretion is not absolute and that the administrative decision is not unreviewable. The majority opinion, however, refers to the standard of review not only as "strictly limited" and "exceedingly narrow," but also as permitting "virtually no substantive review" of the Attorney General's "unfettered discretion." Without citing a single precedent or any other authority, the opinion then states a formula that in practical application must result in the affirmance of every administrative decision. The majority offers no illustration of the kind of hardship that would meet its definition of extremity, but one can hardly imagine anything but death as a hardship so dire that *any* reasonable person would *necessarily* consider it extreme.

This is not the plain meaning of the words of the statute. "Extreme hardship" is simply not restricted to "hardship [that] is uniquely extreme, at or closely approaching the outer limits of the most severe hardship the alien could suffer and so severe that any reasonable person would necessarily conclude that the hardship is extreme." Had Congress intended to restrict relief so narrowly, it could easily have substituted words like those used in the next part of section 244(a), where relief for certain groups of aliens such as convicted criminals and anarchists is limited to cases of "exceptional and extremely unusual hardship." [12] The majority's definition of "extreme hardship" is at least as severe as the plain meaning of these words; yet by distinguishing the language used in these two subsections, Congress made clear its

---

7. 5 U.S.C. § 706 (1982) (emphasis added).

8. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); *see also* 5 K. Davis, *Administrative Law Treatise* § 29:7, at 359 (2d ed. 1984).

9. 8 U.S.C. § 1254 (1982).

10. 8 U.S.C. § 1254(a)(1) (1982) (emphasis added).

11. *INS v. Wang*, 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981).

12. 8 U.S.C. § 1254(a)(2) (1982).

intent to create in the first subsection a more compassionate standard than in the second.

The Supreme Court has interpreted the extreme-hardship requirement only in *INS v. Wang.*[13] Although the majority rely on that decision, *Wang* involved a motion to reopen a deportation order on the basis of extreme hardship, not an initial extreme-hardship determination. The Supreme Court did not specifically address the standard of review—substantial evidence, abuse of discretion, or a determination of arbitrariness or caprice—to be applied to initial Board determinations of no extreme hardship. It concluded only that the Board had not "exceed[ed] its authority" in finding the prima facie showing of extreme hardship insufficient to warrant reopening, and that, therefore, reopening of the deportation hearings was not required.[14]

The majority's assertion that the words "in the opinion of," as used in section 244(a)(1), strictly limit review of "no extreme hardship" determinations to a standard even narrower than ordinary "abuse of discretion" conflicts with the consistent reading that several circuits, including this one, have given to these words when used in other statutes. For example, in *Ahrens v. Rojas,*[15] which involved another section of the Immigration and Nationality Act,[16] we held that determinations made "in the opinion of" the Attorney General are reviewable for simple "abuse of discretion"—

i.e., "a showing that [they are] arbitrary and without reasonable foundation."[17] In *Loftin and Woodard, Inc. v. United States,*[18] we followed an earlier Fifth Circuit case[19] and agreed with seven other circuits[20] in holding that determinations made "in the opinion of" the Commissioner of Internal Revenue pursuant to 26 U.S.C. § 446(b) are reviewable for an "abuse of discretion" which must be "proved by a clear showing."[21] Interpreting another Internal Revenue statute,[22] the Second Circuit in *Caldwell v. Commissioner*[23] held that the standard of review for a determination made "in the opinion of" the Commissioner of Internal Revenue was "abuse of discretion."[24]

Until today, then, judicial interpretation of the phrase "in the opinion of" has uniformly allowed a standard of review at least as broad as "clear abuse of discretion." A multitude of statutes contain similar articulations. More than 150 of these are listed in the appendix. In an attempt to reconcile their opinion with previous decisions interpreting the words "in the opinion of," the majority argue that section 244(a)(1) contains a "double insulation" rendering it more deferential to the executive branch than other statutes that use this phrase. Congress, however, surely did not intend by the mere use of the word "extreme" to depart from the general review standards of the Administrative Procedure Act as applied in all of these instances.

---

**13.** 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981).

**14.** *Id.* at 146, 101 S.Ct. at 1032.

**15.** 292 F.2d 406 (5th Cir.1961).

**16.** 8 U.S.C. § 1182(d)(5)(A) (1982).

**17.** *Id.* at 411.

**18.** 577 F.2d 1206 (5th Cir.1978).

**19.** *See Wood v. Commissioner,* 245 F.2d 888, 892 (5th Cir.1957).

**20.** *See RCA Corp. v. United States,* 664 F.2d 881, 886, 888, 889 (2d Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982); *Sandor v. Commissioner,* 536 F.2d 874, 875 (9th Cir.1976); *Stephens Marine, Inc. v. Commissioner,* 430 F.2d 679, 686 (9th Cir.1970); *Wilkinson-Beane, Inc. v. Commissioner,* 420 F.2d 352, 353

n. 3 (1st Cir.1970); *Standard Paving Co. v. Commissioner,* 190 F.2d 330, 332 (10th Cir.), *cert. denied,* 342 U.S. 860, 72 S.Ct. 87, 96 L.Ed. 647 (1951); *Schram v. United States,* 118 F.2d 541, 543–44 (6th Cir.), *cert. denied,* 314 U.S. 695, 62 S.Ct. 412, 86 L.Ed. 555 (1941); *Hempt Bros., Inc. v. United States,* 354 F.Supp. 1172, 1181 (M.D.Pa.1973), *aff'd,* 490 F.2d 1172 (3d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974); *Peterson Produce Co. v. United States,* 205 F.Supp. 229, 241 (W.D.Ark.1962), *aff'd,* 313 F.2d 609 (8th Cir.1963).

**21.** *Loftin and Woodard, Inc. v. United States,* 577 F.2d at 1229.

**22.** 26 U.S.C. § 471 (1987).

**23.** 202 F.2d 112 (2d Cir.1953).

**24.** *Id.* at 114–15.

The late Judge Friendly wrote, in *Wong Wing Hang v. INS*,[25] that exercise of the Attorney General's discretion is "subject to the restraint of the obligation of reasoned decision and hence of reasoned elaboration of a fabric of doctrine governing successive decisions." Discretion must be exercised with reason, else it is but caprice. The essence of the rational exercise of power is the explanation of its use. Neither the hearing officer nor the Board of Immigration Appeals, however, has provided us with such an explanation.

In determining what Congress intended to be the breadth of administrative discretion and the scope of judicial review over its exercise, we should also consider the rank of the official whose decision is reviewed.[26] Congress may rightly decide that cabinet officers deserve more latitude in making decisions than is accorded lower-ranking civil servants in making routine pronouncements. As the majority opinion recognizes, however, it was not the Attorney General who made or reviewed this administrative decision. He has delegated his authority to 65 special inquiry officers, as the statute labels them, who have by regulation been elevated in title to judges. Their decisions are in turn subject to review only by an internal group, the Board of Immigration Appeals. Neither the Attorney General, his Deputy Attorney General, nor any of his Assistant Attorneys General has ever considered whether deportation of the Hernandez family would occasion them extreme hardship. This decision was made in the depths of the bureaucracy.

Another factor in defining the scope of discretion is the unique expertise of the agency on the subject in question.[27] The determination of what constitutes extreme hardship for a person or a family is not an esoteric question requiring specialized training or familiarity with technical materials. Although the hearing officer and the

Board of Immigration Appeals are able, through their exposure to a wide range of cases, to develop comparisons between applicants, their determination of what constitutes hardship requires knowledge of human affairs, judgment, and empathy—qualities that federal judges should have in at least as much measure as administrative officers.

The leitmotiv of the majority opinion is, "Let the bureaucracy do as it will." The Administrative Procedure Act, however, commands us to review the decisions of such administrative officers to determine whether they have made a clear error of judgment. If they have, the decision is an abuse of discretion.

## II.

Patricio Hernandez-Cordero is now 34 years of age. His wife, Maria, is 37. They have lived in the United States for twelve years, Patricio since he was 22 and Maria since she was 25. Three of their children, Patricio, Jr., now 11, Lisa, 9, and Veronica, 8, are United States citizens who have never lived in another country. Mrs. Hernandez has a fourth child, Victor, who is now 14. Born in Mexico, he lived there with his mother's family until he was brought to the United States six years ago to become a member of the Hernandez family.

The Immigration and Naturalization Service has stipulated that the Hernandezes are of good moral character. The hearing officer found that the Hernandez couple is "industrious, law-abiding, and the type that anyone would desire as a next-door neighbor." They are, as the majority opinion states, a family that "[a]ny of us would be happy to see ... gain citizenship."

The family lives in Georgetown, Texas, where Hernandez built a home on a lot purchased in 1983. Hernandez, who is self-employed as a trim carpenter, earns $12,000 a year, and has, through hard work

---

**25.** 360 F.2d 715, 718 (2d Cir.1966).

**26.** *See* T. Aleinikoff & D. Martin, *Immigration Process and Policy* 528–30 (1985); *cf.* K. Davis, *Administrative Law Treatise* § 29.00–3, at 543–44 (Supp.1982).

**27.** *See* K. Davis, *Administrative Law Treatise* § 29.00–3, at 543–44 (Supp.1982) (analyzing *National Resources Defense Council v. SEC*, 606 F.2d 1031 (D.C.Cir.1979).

and thrift, accumulated assets having a total value of $70,000. These assets include their home; a motor vehicle; his tools; and another piece of real estate (unimproved), for which they have fully paid.

The hearing officer found, and the majority concede, that deportation would cause the family hardship. Hardened, however, after seeing many others deported, he evaluated as less than extreme the hardship that being completely uprooted would impose on the family.

The administrative appraisal of the suffering that would be endured by this family was piecemeal, devoid of compassion, and wrong. Tick by tick the hearing officer separately evaluated each individual hardship: Selling a home at a loss is an economic hardship, but not extreme. Besides, the wound is "self-inflicted" because the house was built several months after deportation proceedings were begun. For a family to give up its hard-won economic sufficiency is a hardship, but it is well established that economic hardship *alone* cannot constitute "extreme hardship"—as the majority opinion repeats, even citing one of our decisions for that undisputed, but isolated, observation. The displaced family will leave behind many friends and relatives, and this too is a hardship; yet, according to the administrative finding, it also is not extreme.

While the four children speak Spanish, all of them have entered American schools, and none reads or writes Spanish. The hearing officer found that it may be difficult for them to adjust to life in Mexico, a country that three of them have never known, but that they can do so without "extreme" hardship: After all, as the Board of Immigration Appeals indifferently noted, their circumstances in this respect are not "significantly different" from those of other native-born American children returning to their parents' homeland.

The hearing officer considered all families to be fungible and, therefore, apparently attached no weight to affidavits from: (1) a psychologist, concluding that the Hernandez family would suffer severe emotional and psychological consequences if forced to return to Mexico; (2) an economist, detailing the severe economic hardship that the family would encounter; and (3) six teachers, describing the serious educational and emotional difficulty that the school-age Hernandez children would suffer if their parents were deported and they perforce accompanied the family.

"The *mere* fact," the hearing officer wrote, "that Mexico is in the midst of an economic crisis does not mean that there are *no* employment opportunities there." He does not mention, however, the evidence that construction techniques are so different in Mexico that Hernandez would likely find no employment for his American-learned skill as a trim carpenter. Mrs. Hernandez is "relatively healthy," the administrative appraisal recites, even though she suffers from asthma and requires treatment and medication that she probably could not afford to continue in Mexico.

Testimony from employers, creditors, and teachers confirms that the Hernandezes are an exemplary family who have worked long and hard to establish a life for themselves in the United States and who would suffer devastating consequences if deported to Mexico. Although a recitation of evidence from the record is sometimes redundant, in this instance it is the only way adequately to portray the family.

Dan Johnson, Vice President of American Bank Round Rock, which financed the Hernandezes' home, says: "[Patricio] has obtained several loans here and has handled them in a very satisfactory manner.... [He] makes his living as a trim carpenter; and he takes a great deal of pride not only in his work, but in the many tools he has acquired over the years.... It is my opinion that Patricio Hernandez and his family would be an asset to any country in which they chose to live. He takes pride in his work; and his word is his bond."

John D. Byram, a ranch owner, states that Maria Hernandez, who has received only a second grade education and first came to the United States in her teens, worked for him on his ranch from 1972 until 1977. Her husband worked for him

from 1975 to 1977. "Since that time I have had continued contact with the Hernandez family. I consider them to be outstanding people who would be a great asset to American society. They are hard working, and persons of the highest moral caliber. They have assimilated themselves well into our society."

Sue Levens, who holds a master's degree and teaches in the bilingual program of the Georgetown Independent School District, and Cynthia Balfour, a kindergarten teacher, attest not only to the conscientiousness of the Hernandez children in school, but also praise the cooperation and participation of the Hernandez parents in school projects, parent conferences, and other school functions.

Laura Wheeler, an elementary school teacher in the Round Rock Independent School District, writes of Lisa and Patricio: "They are very highly motivated children. They are well-adjusted and have made many friends here .... I believe it would be extremely difficult for Lisa and Patricio to leave familiar surroundings and enter an environment that they would be totally unaccostumed [sic] to." Another teacher, Shari Wittenberg, writes of Patricio: "He has made many friends, not only in his class, but with other students on our campus. The other children enjoy his company. Patricio is a hard worker and does his very best.... I would hate to think of a child like Patricio being pulled from our school system and placed in an unfamiliar setting. He has so much potential that I feel could be lost if he was put into an atmosphere that would distract his learning abilities." Wendy Turner, one of Patricio's teachers, writes: "He was always smiling and had a positive outlook. I sincerely believe that a drastic change such as being sent to Mexico would have a very negative effect on Patricio."

Erlene Smith, Guidance Counselor for Northside Middle School in Georgetown, Texas, says of Victor Hernandez: "His grades for the 83/84 school year were all A's and B's .... [He] speaks English fluently and [has been] released from bilin-gual classes .... [H]e is a well-adjusted young man with many friends. Under these circumstances, it is likely that he would have academic and social difficulties if he were forced to move back to Mexico ...."

Even if each of the factors listed by the hearing officer, considered singly, did not amount to extreme hardship for the Hernandez parents or any of their three citizen children, the decision that, taken together, they do not, ignores the evidence so completely as to be arbitrary and capricious. Determining when the cumulative effect of hardship, like the cumulative effect of pain, becomes "extreme" obviously calls for judgment. There is no barometer. When, however, so many hardships are to be imposed, the decision that their impact will not be extreme should not rest merely on the ritualistic incantation of the formula, "having considered all of the factors presented, both individually and cumulatively." The majority are content both to approve this conjuration and to repeat it because there is "little else ... the BIA could have said on the subject," [28] and because they find no hardship "extreme" unless it is "uniquely extreme."

Thus, the special inquiry officer and the Board of Immigration Appeals—subordinate government officers—washed their hands of the Hernandez family and of their duty to implement Congress' humanitarian policy. Congress could, of course, have ordered all illegal aliens deported. It chose, for benevolent reasons, not to exercise this power when doing so would occasion "extreme hardship." Although it reserved the power to overturn decisions that are too clement, it obviously intended mercy else it would have permitted no relief. The statutory measure of mercy is to avoid the infliction of hardship that is "extreme." The hardship inflicted on this family defies any reasonable application of that term and requires our intervention.

It is possible that this family may ultimately be saved by invoking the compassionate amnesty provisions of the Immigra-

---

**28.** *Cf. Sanchez v. INS,* 755 F.2d 1158, 1160 (5th Cir.1985).

tion Reform and Control Act of 1986.[29] The majority do not agree that, as we have done in other cases at the suggestion of the government,[30] we should stay our decision to give the Hernandezes a chance to apply for a change of status under that newly enacted statute. They may indeed be able to meet its requirements, but, until they show that they can do so, the case is not technically moot. Even if the Hernandezes are rescued by this act of Congressional grace, however, the majority decision will abandon other families in like circumstances to equally unfettered and unfeeling judgments by the bureaucracy.

### III.

The majority conclude, "a court has virtually no substantive review of the BIA's 'extreme hardship' finding." This limits the judicial role far more narrowly than Congress intended. The application of any reasonable "abuse of discretion" standard requires relief for this unusual family. Deportation will inflict on each of its members, and on the family collectively, the most severe personal, economic, social, and psychological hardship. That kind of injury is extreme. However much latitude is given the immigration officials by the statute, their decision that the Hernandez family will not suffer hardship in the extreme as a result of the totality of circumstances is callous and unmindful of the will of Congress. It observes suffering without compassion, and insensitively dismisses the agony of others as pain that it is not an extreme hardship for those *others* to bear. It is therefore arbitrary and capricious, and a complete abuse of discretion. It is our duty to adopt a proper standard of review and reverse it.

For these reasons, I respectfully DISSENT.

### APPENDIX

Statutes placing discretion in the opinion of the President, the Attorney General, or a Cabinet Secretary

**29.** Pub.L. No. 99–603, § 201, 100 Stat. 3359, 3394 (to be codified at 8 U.S.C. § 1255A).

**30.** For examples of orders granting stays, see *Lopez-Rayas v. INS,* No. 85–4732 (5th Cir. Feb. 19, 1987); *De Silva v. INS,* No. 85–4496 (5th Cir.

1.  1 U.S.C. § 112b(a) (1982) ("in the opinion of the President").

2.  2 U.S.C. § 27 (1982) ("in the opinion of the President").

3.  5 U.S.C. § 8123(b) (1982) ("in the opinion of the Secretary [of Labor]").

4.  7 U.S.C. § 150dd(d) (1982) ("in the opinion of the Secretary [of Agriculture]").

5.  *Id.* § 389 (1982) ("in the opinion of the Secretary of Agriculture").

6.  *Id.* § 389a (1982) ("in the opinion of the Secretary of Agriculture").

7.  *Id.* § 499f(a) (1982) ("in the opinion of the Secretary [of Agriculture]").

8.  *Id.* § 499f(c) (1982) ("in the opinion of the Secretary [of Agriculture]").

9.  *Id.* § 936a(c) (1982) ("in the opinion of the Secretary of the Treasury").

10. *Id.* § 1964(d) (Supp. III 1985) ("in the opinion of the Secretary [of Agriculture]").

11. *Id.* § 2805(c) (1982) ("in the opinion of the Secretary [of Agriculture]").

12. 8 U.S.C. § 1182(a)(15) (1982) ("in the opinion of the Attorney General").

13. *Id.* § 1182(d)(5)(A) (1982) ("in the opinion of the Attorney General").

14. *Id.* § 1251(a)(8) (1982) ("in the opinion of the Attorney General").

15. *Id.* § 1251(c) (1982) ("in the opinion of the Attorney General").

16. *Id.* § 1253(c) (1982) ("in the opinion of the Attorney General").

17. *Id.* § 1253(f) (1982) ("in the opinion of the Attorney General").

18. *Id.* § 1445(a) (1982) ("in the opinion of the Attorney General").

19. 10 U.S.C. § 804(c) (1982) ("in the opinion of the President").

20. *Id.* § 875(c) (1982) ("in the opinion of the President").

21. *Id.* § 4354(b) (1982) ("in the opinion of the Secretary [of the Army]").

Jan. 5, 1987); *Galvan v. INS,* No. 86–4365 (5th Cir. Dec. 29, 1986); *Hidalgo-Zelaya v. INS,* No. 86–4411 (5th Cir. Dec. 23, 1986); *Pouralborz v. INS,* No. 86–4391 (5th Cir. Dec. 23, 1986).

22. *Id.* § 4501(c) (1982) ("in the opinion of the Secretary of the Army").

23. *Id.* § 6202 (1982) ("in the opinion of the Secretary of the Navy").

24. *Id.* § 9354 (1982) ("in the opinion of the Secretary [of the Air Force]").

25. *Id.* § 9501(c) (1982) ("in the opinion of the Secretary of the Air Force").

26. *Id.* § 9779(b) (1982) ("in the opinion of the Secretary [of the Air Force]").

27. 12 U.S.C. § 1715*l* (d)(3) (1982) ("in the opinion of the Secretary [of Housing and Urban Development]").

28. *Id.* § 1715v(c)(3) (1982) ("in the opinion of the Secretary [of Housing and Urban Development]").

29. 15 U.S.C. § 21(b) (Supp. III 1985) ("in the opinion of the ... Secretary [of Transportation]").

30. *Id.* § 144(b)(1) (1982) ("in the opinion of the Secretary [of Commerce]").

31. *Id.* § 640(b) (1982) ("in the opinion of the President").

32. 16 U.S.C. § 40b (1982) ("in the opinion of the Secretary of the Interior").

33. *Id.* § 242 (1982) ("in the opinion of the Secretary of the Interior").

34. *Id.* § 407m (1982) ("in the opinion of the Secretary [of the Interior]").

35. *Id.* § 430k (1982) ("in the opinion of the Secretary of the Interior").

36. *Id.* § 458a (1982) ("in the opinion of the Secretary [of the Interior]").

37. *Id.* § 459b–2(a) (1982) ("in the opinion of the Secretary [of the Interior]").

38. *Id.* § 459c–4(a) (1982) ("in the opinion of the Secretary [of the Interior]").

39. *Id.* § 459d–2(a) (1982) ("in the opinion of the Secretary [of the Interior]").

40. *Id.* § 459f–11(b) (1982) ("in the opinion of the Secretary [of the Interior]").

41. *Id.* § 460*o*–2(a) (1982) ("in the opinion of the Secretary of the Interior").

42. *Id.* § 460kk(n)(4)(B) (1982) ("in the opinion of the Secretary [of the Interior]").

43. *Id.* § 485 (1982) ("in [the Secretary of Agriculture's] opinion").

44. *Id.* § 518 (1982) ("in the opinion of the Secretary of Agriculture").

45. *Id.* § 666g (1982) ("in the opinion of the Secretary of the Army").

46. *Id.* § 675 (1982) ("in the opinion of the President").

47. *Id.* § 691c (1982) ("in the opinion of the Secretary of the Interior").

48. *Id.* § 695a (1982) ("in the opinion of the Secretary of the Interior").

49. *Id.* § 696a (1982) ("in the opinion of the Secretary of the Interior").

50. *Id.* § 715e (1982) ("in the opinion of the Secretary of the Interior").

51. *Id.* § 773i(f)(2) (1982) ("in the opinion of the Secretary [of Commerce]").

52. *Id.* § 809 (1982) ("in the opinion of the President").

53. *Id.* § 825s (1982) ("in the opinion of the Secretary of the Army").

54. *Id.* § 831d(i) (1982) ("in [the President's] opinion").

55. *Id.* § 835c(b) (1982) ("in the opinion of the Secretary [of the Interior]").

56. *Id.* § 1244(d)(3) (Supp. III 1985) ("in the opinion of the Secretary [of the Interior or of Commerce]").

57. *Id.* § 1533(b)(8) (1982) ("in the opinion of the Secretary [of the Interior]").

58. *Id.* § 1643(b) (1982) ("in the opinion of the Secretary [of Agriculture]").

59. 18 U.S.C. § 843(d) (1982) ("in the opinion of the Secretary [of the Treasury]").

60. *Id.* § 2101(d) (1982) ("in the opinion of the Attorney General").

61. *Id.* § 2386(A)(5) (1982) ("in the opinion of the Attorney General").

62. *Id.* § 4003 (1982) ("in the opinion of the Attorney General").

63. 19 U.S.C. § 81c(a) (Supp. III 1985) ("in the opinion of the Secretary of the Treasury").

64. *Id.* § 1491(b)(1) (1982) ("in the opinion of the Secretary [of the Treasury]").

65. *Id.* § 1498(a)(11) (1982) ("in the opinion of the Secretary of the Treasury").

66. *Id.* § 1526(e)(2) (1982) ("in the opinion of the Secretary [of the Treasury]").

67. 20 U.S.C. § 1087–2(j) (1982) ("in the opinion of the Secretary [of Education]").

68. 21 U.S.C. § 101 (1982) ("in the opinion of the President").

69. *Id.* § 113a (1982) ("in the opinion of the Secretary [of Agriculture]").

70. *Id.* § 114a (1982) ("in the opinion of the Secretary [of Agriculture]").

71. *Id.* § 114c (1982) ("in the opinion of the Secretary [of Agriculture]").

72. *Id.* § 375(b) (1982) ("in the opinion of the Secretary [of Health and Human Services]").

73. *Id.* § 967 (1982) ("in the opinion of the Secretary of the Treasury").

74. 22 U.S.C. § 277f ("in the opinion of the Secretary of State").

75. *Id.* § 1978(a)(3)(B) (1982) ("in the opinion of the Secretary [of Commerce or the Interior]").

76. *Id.* § 2304(c)(1)(C) (1982) ("in the opinion of the Secretary of State").

77. *Id.* § 2314(g)(4)(A)(iii) (1982) ("in the opinion of the President").

78. *Id.* § 2755(d)(1)(C) (1982) ("in the opinion of the President").

79. *Id.* § 3311(a) (1982) ("in the opinion of the President").

80. *Id.* § 3618 (1982) ("in the opinion of the President").

81. *Id.* § 4084(c) (1982) ("in the opinion of the Secretary of State").

82. 25 U.S.C. § 48 (1982) ("in the opinion of the Secretary of the Interior").

83. *Id.* § 229 (1982) ("in the opinion of the President").

84. *Id.* § 263 (1982) ("in [the President's] opinion").

85. *Id.* § 312 (1982) ("in [the Secretary of the Interior's] opinion").

86. *Id.* § 348 (1982) ("in the opinion of the President").

87. *Id.* § 564n (1982) ("in the opinion of the Secretary [of the Interior]").

88. *Id.* § 636 (1982) ("in the opinion of the Secretary of the Interior").

89. *Id.* § 677k (1982) ("in the opinion of the Secretary [of the Interior]").

90. *Id.* § 677u (1982) ("in the opinion of the Secretary [of the Interior]").

91. *Id.* § 700 (1982) ("in the opinion of the Secretary [of the Interior]").

92. *Id.* § 753 (1982) ("in the opinion of the Secretary [of the Interior]").

93. *Id.* § 1463 (1982) ("in the opinion of the Secretary [of the Interior]").

94. *Id.* § 1522(b) (1982) ("in the opinion of the Secretary [of the Interior]").

95. 26 U.S.C. § 446(b) (1982) ("in the opinion of the Secretary [of the Treasury]").

96. *Id.* § 471 (1982) ("in the opinion of the Secretary [of the Treasury]").

97. *Id.* § 7324(2) (1982) ("in the opinion of the Secretary [of the Treasury]").

98. *Id.* § 7325 (1982) ("in the opinion of the Secretary [of the Treasury]").

99. *Id.* § 7513(b) (1982) ("in the opinion of the Secretary [of the Treasury]").

100. 29 U.S.C. § 176 (1982) ("in the opinion of the President").

101. *Id.* § 502(a) (1982) ("in the opinion of the Secretary [of the Treasury]").

102. *Id.* § 1112(e) (1982) ("in the opinion of the Secretary [of Labor]").

103. 30 U.S.C. § 206 (1982) ("in [the Secretary of the Interior's] opinion").

104. *Id.* § 211(c) (1982) ("in the opinion of the Secretary [of the Interior]").

105. *Id.* § 642(c) (1982) ("in the opinion of the Secretary [of the Interior]").

106. *Id.* § 865(a) (1982) ("in the opinion of the Secretary [of the Interior]").

107. *Id.* § 923(c) (1982) ("in the opinion of the Secretary [of the Interior]").

108. *Id.* § 1001 (1982) ("in the opinion of the Secretary [of the Interior]").

109. 33 U.S.C. § 410 (1982) ("in the opinion of the Secretary of the Army").

110. *Id.* § 415 (1982) ("in the opinion of the Secretary of the Army").

111. *Id.* § 494 (1982) ("in the opinion of the Secretary of Transportation").

112. *Id.* § 499(a) (1982) ("in the opinion of the Secretary of Transportation").

113. *Id.* § 513 (1982) ("in the opinion of the Secretary [of Transportation]").

114. *Id.* § 583 (1982) ("in the opinion of the Secretary of the Army").

115. *Id.* § 591 (1982) ("in the opinion of the Secretary of the Army").

116. *Id.* § 629 (1982) ("in the opinion of the Secretary of the Army").

117. *Id.* § 702d (1982) ("in the opinion of the Secretary of the Army").

118. *Id.* § 855 (Supp. III 1985) ("in the opinion of the President").

119. *Id.* § 944(e) (Supp. III 1985) ("in the opinion of the Secretary [of Labor]").

120. *Id.* § 1124(d) (1982) ("in the opinion of the Secretary [of Commerce]").

121. *Id.* § 1904(e) (1982) ("in the opinion of the Secretary [of the relevant department]").

122. 36 U.S.C. § 3204 (Supp. III 1985) ("in the opinion of the Secretary of the Navy, the Secretary of the Air Force, or the Secretary of Army").

123. 38 U.S.C. § 5014(b) (1982) ("in the opinion of the President").

124. 40 U.S.C. § 258e (1982) ("in the opinion of the Attorney General").

125. *Id.* § 874(e)(2) (Supp. III 1985) ("in the opinion of the Secretary of the Interior").

126. 41 U.S.C. § 11a (1982) ("in the opinion of the Secretary of the Army").

127. 42 U.S.C. § 300s–4(b)(2) (1982) ("in the opinion of the Secretary [of Health and Human Services]").

128. *Id.* § 1473 (1982) ("in the opinion of the Secretary [of Health and Human Services]").

129. *Id.* § 3141(a)(2) (1982) ("in the opinion of the Secretary [of Health and Human Services]").

130. *Id.* § 3142(b)(4) (1982) ("in the opinion of the Secretary [of Health and Human Services]").

131. *Id.* § 3161(b) (1982) ("in the opinion of the Secretary [of Health and Human Services]").

132. *Id.* § 3214(e) (1982) ("in the opinion of the Secretary [of Health and Human Services]").

133. *Id.* § 4654(c) (1982) ("in the opinion of the . . . Attorney General").

134. *Id.* § 8402(e)(2) (1982) ("in the opinion of the Secretary [of Health and Human Services]").

135. *Id.* § 10508(b) (Supp. III 1985) ("in the opinion of the Attorney General").

136. 43 U.S.C. § 125 (1982) ("in [the President's] opinion").

137. *Id.* § 145 (1982) ("in the opinion of the Secretary of the Interior").

138. *Id.* § 154 (1982) ("in [the Secretary of the Interior's] opinion").

139. *Id.* § 315j (1982) ("in the opinion of the Secretary of the Interior").

140. *Id.* § 374 (1982) ("in the opinion of the Secretary of the Interior").

141. *Id.* § 375 (1982) ("in the opinion of the Secretary of the Interior").

142. *Id.* § 375b (1982) ("in the opinion of the Secretary [of the Interior]").

143. *Id.* § 417 (1982) ("in the opinion of the Secretary [of the Interior]").

144. *Id.* § 419 (1982) ("in the opinion of the Secretary [of the Interior]").

145. *Id.* § 434 (1982) ("in the opinion of the Secretary of the Interior").

146. *Id.* § 466 (1982) ("in the opinion of the Secretary [of the Interior]").

147. *Id.* § 470 (1982) ("in the opinion of the Secretary of the Interior").

148. *Id.* § 561 (1982) ("in the opinion of the Secretary of the Interior").

149. *Id.* § 570 (1982) ("in the opinion of the Secretary of the Interior").

150. *Id.* § 1196 (1982) ("in the opinion of the Secretary of the Interior").

151. 44 U.S.C. § 1301 (1982) ("in the opinion of the Secretary [of Agriculture]").

152. 45 U.S.C. § 94 (1982) ("in the opinion of the President").

153. *Id.* § 722(b) (1982) ("in the opinion of the . . . Secretary [of Transportation]").

154. 46 U.S.C.App. § 866 (Supp. III 1985) ("in the opinion of the Secretary [of Commerce]").

155. *Id.* § 875 (Supp. III 1985) ("in the opinion of the President").

156. *Id.* § 1111(f) (Supp. III 1985) ("in the opinion of . . . the Secretary of Transportation").

157. *Id.* § 1124(a) (Supp. III 1985) ("in the opinion of the Secretary of Transportation").

158. *Id.* § 1152(b) (Supp. III 1985) ("in the opinion of the Secretary [of Transportation]").

159. *Id.* § 1211 (Supp. III 1985) ("in the opinion of the Secretary of Transportation").

**574**

160. *Id.* § 1247(b) (Supp. III 1985) ("in the opinion of the Secretary [of Transportation]").
161. *Id.* § 1286 (Supp. III 1985) ("in the opinion of the Secretary [of Transportation]").
162. 49 U.S.C.App. § 1604(j)(4) (1982) ("in [the Secretary of Transportation's] opinion").
163. *Id.* § 1653(i)(3) (1982) ("in the opinion of the Secretary [of Transportation]").
164. *Id.* § 1654(m)(2) (1982) ("in the opinion of the Secretary [of Transportation]").
165. 50 U.S.C. § 167c(b) (1982) ("in the opinion of the Secretary [of the Interior]").
166. *Id.* § 453(a)(6) (1982) ("in the opinion of the Secretary [of Defense]").
167. 50 U.S.C.App. § 4(b) (1982) ("in the opinion of the President").
168. *Id.* § 10(i) (1982) ("in the opinion of the President").
169. *Id.* § 1741(d) (1982) ("in [the Secretary of Transportation's] opinion").