**Abdi DULANE, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 94–9504.

United States Court of Appeals, Tenth Circuit.

Jan. 26, 1995.

Daniel M. Kowalski, Denver, CO, for petitioner.

Alison R. Drucker, Office of Immigration Litigation, Dept. of Justice (Carl H. McIntyre, Jr., Office of Immigration Litigation, Dept. of Justice, Frank W. Hunger, Asst. Atty. Gen., and David J. Kline, Asst. Director, on the brief), Washington, DC, for respondent.

Before MOORE and KELLY, Circuit Judges, and KANE, Senior District Judge *.

KANE, Senior District Judge.

Abdi Dulane has petitioned for review of the decision of the Board of Immigration Appeals (BIA) denying his motion to reopen and remand and dismissing his appeal from the denial of his requests for asylum and withholding of deportation. Dulane asks in the alternative that we reinstate the period of voluntary departure. We exercise jurisdiction over and grant the petition for review pursuant to 8 U.S.C. § 1105a(a). We reverse and remand for further proceedings. We lack jurisdiction to rule on the issue of reinstatement of the period of voluntary departure.

I. *Background.*

Abdi Dulane entered the United States from Somalia on a student visa on June 11, 1983. He filed applications requesting asylum in September 1983 and June 1988 but received no response from the Immigration and Naturalization Service (INS). He filed a third application for asylum in November 1988.

On January 30, 1989 the INS sent Dulane a notice of intent to deny his request for asylum. It attached a *pro forma* advisory opinion from the State Department dated

* Honorable John L. Kane, Jr., Senior United States District Judge for the District of Colorado, sitting by designation.

December 29, 1988 stating that Dulane had failed to demonstrate a well-founded fear of persecution upon return to Somalia. By March 21, 1991 the State Department had changed its opinion about conditions in Somalia indicating that conditions there are "extraordinarily dangerous." [1]

On February 15, 1989, the INS wrote Dulane in response to a letter apparently received from him.[2] The INS stated Dulane had stressed in his letter that he was not a citizen of Somalia, but had obtained a Somali passport solely as a means of leaving that country. The INS pointed out that on the request for asylum form (Form I–589), Dulane had stated his nationality at birth was Somali (ethnic Ethiopian), that his present nationality was Somali and that he was born in the town of "Mogadishu, Somalia, South Africa. [sic.]" (Cert.Admin.R. at 235.) [3]

The INS stated although Dulane had indicated in his letter he had received new evidence since the time of his interview, he had not submitted any such evidence in rebuttal of the State Department's advisory opinion. Accordingly, the INS denied Dulane's request for asylum and ordered him to depart from the United States within thirty days.

On March 16, 1989, the INS commenced deportation proceedings against Dulane by the issuance of an order to show cause. The INS charged Dulane with deportability because he had remained in the United States after the termination of his authorized schooling and had failed to comply with the conditions of his nonimmigrant status.

On October 3, 1989, Dulane appeared at a deportation hearing before an immigration judge (IJ). Dulane explained he could not afford counsel. The IJ gave him a copy of a legal aid list and postponed the case until October 17, 1989.

On October 17, 1989, Dulane appeared with a letter from the Thursday Night Bar Program[4] stating that his application had been accepted but that the process of obtaining an attorney might take from two to six weeks. Dulane told the IJ an attorney was not guaranteed, he was confident he would win the case, and wanted to proceed.

Dulane pleaded guilty to the allegations in the order to show cause, admitting all of them, except allegations two and five. He denied he was a native and citizen of Somalia and that he had terminated his authorized course of study. He also denied the two charges of deportability. The IJ continued the hearing until January 5, 1990.

On that date, Dulane again appeared pro se and testified to his history as outlined above. Only after Dulane had told the IJ he had applied for political asylum, did the INS admit it had received three such applications which had been pending since 1983. The IJ asked Dulane to review the three applications in the INS' file. Dulane did so and replied in the affirmative to the IJ's inquiry as to whether he wanted to renew his request for asylum. The three applications were admitted into evidence. The IJ made changes in red on one of the applications based on the information Dulane had given him to the effect that Dulane's nationality both at birth and at present was Ethiopian.[5]

The IJ then asked if the State Department had ever rendered an opinion and the INS produced its letter of denial of asylum dated February 15, 1989 and the advisory opinion dated December 29, 1988. The opinion stated, on the basis of Dulane's request for asylum form, he had failed "to demonstrate ... a well-founded fear of persecution upon re-

---

1.  See *infra* note 6 and Cert.Admin.R. at 46.

2.  A copy of the letter is not included in the certified administrative record.

3.  In fact the form reflects birth in "Mogadishu, Somalia, E. Africa." The author of the INS letter apparently did not perceive that Somalia and Ethiopia are neighboring countries in East Africa, a significant factor in this case, and not in any way connected with South Africa.

4.  This is a program of the Denver Bar Association which, *inter alia,* attempts to obtain attorneys for indigent individuals.

5.  Nowhere in the course of the proceedings has the inefficiency of the INS in failing to process Dulane's first two requests for asylum, been considered. To the contrary, the INS has sought to capitalize on inconsistencies between the three requests. The BIA has also focussed on these to Dulane's detriment.

turning to Somalia." Cert.Admin.R. at 238. The opinion acknowledged:

We do not have independent information about this applicant.

The strength of the application may be affected by your interview or hearing, or additional information subsequently presented by the applicant. Should you believe that any such additional information warrants further consideration, we will be happy to review the file again.

*Id.* [6]

Dulane pointed out the INS' error regarding "South Africa" to the IJ. Dulane stated it was clear from a document of the Somali government, reflecting Dulane's birth in Ethiopia and his refugee status, that he was not of Somali nationality.[7] He explained he was told by an employee of the INS when he first applied for asylum he had to put as his place of birth that reflected in his passport, namely Mogadishu, Somalia. Dulane testified he had purchased the Somali passport as a means of leaving Somalia and that it had since expired. He argued he had been denied asylum based on misinformation.

At the hearing, Dulane testified to and introduced documentation evidencing the following facts: He was born the son of an Ogaden nomad in Warder, in the region of the Ogaden, *quondam* Ethiopia, in 1962. Clans of the Ogaden have for some years asserted secession from Ethiopia. Dulane's father, Dulane Rafle Guleed, was the chief tribal leader of a sub-clan of the Ogaden, a well-known leader of the secessionist movement and opponent of the Mengistu regime. He was also Governor of the south eastern Harar province and a Brigadier General in the provincial militia. As an accepted cultural norm, Dulane's father practiced polygamy and Dulane has many siblings and half-siblings.

In 1976, the Ethiopian government sentenced Dulane's father to death by a firing squad for subversive acts. The Chief Supreme Dergue at the time commuted the sentence and ordered the father placed under house arrest for the rest of his life.

Dulane went to Addis Ababa to attend secondary school and lived with a relative within his extended family structure. He testified at that time the Ethiopian Government persecuted the Ogaden nomads who were trying to secede by poisoning their wells, thus depriving the people and their animals of water. The government attempted to assimilate these nomadic people into the Ethiopian population, strip them of their ethnic character and force them to abandon their animistic religious beliefs and become Ethiopian Orthodox Christians.

When Dulane returned from school in Addis Ababa, he lived with a relative in a grass hut in Warder in the Ogaden for four or five months. Because of the Ethiopian government's persecution of the Ogaden nomads, Dulane's family had been forced to flee into Somalia. At the age of about seventeen, Dulane fled to Somalia where he remained in a refugee camp for about one-and-a-half years. He received a document dated January 6, 1983, stating that he was a refugee from the Ogaden and had been registered at the National Refugee Commission Counselling Office in Somalia.

Two of Dulane's relatives, an uncle and cousin, living in the Ogaden, were among several people killed when the Ethiopian regime accused them of collaborating with the Ogaden Liberation Front, fighting for the independence of the Ogaden.

Dulane testified he paid about $42.00 for a Somali passport on the black market which the Somali government endorsed for 1981–1984 on the promise that Dulane would leave the country and not return. He used the passport to go to Saudi Arabia to earn money to leave Somalia. He worked for about five months in construction and remained in Sau-

---

**6.** We caution against reliance on such *pro forma* opinion as a basis for denial of asylum. As the opinion itself states, the State Department has no independent information about the applicant. Moreover, as is shown by a later generic opinion of the State Department, dated March 21, 1991 (relating to another request for asylum), condi-

tions in Somalia have changed since the December 29, 1988 advisory opinion on Dulane's application. *See* Cert.Admin.R. at 46.

**7.** Dulane had submitted this document together with his request for asylum.

di Arabia for a further seven months during which he was unemployed and stayed with friends.

Dulane returned to Somalia for about a week in early 1983 and obtained a student visa for the United States to attend Columbia University. He entered the United States on June 11, 1983. He could not afford to study at Columbia and enrolled at Manhattan Community College for two and a half semesters. In 1985, he was forced to quit school for financial reasons.

In response to questioning by counsel for the INS, Dulane recounted the persecution which his nomadic family had suffered at the hands of the Ethiopian government. He said he belonged to an ethnic group which did not believe in the official religion of Orthodox Christianity, spoke its own language and was fighting for self-determination. He explained his father, a secessionist, had been persecuted in Ethiopia and for that reason Dulane too feared persecution. His uncle and cousin, suspected of collaborating with secessionists, had been killed and mutilated in Harar in the Ogaden by Ethiopian soldiers.

Dulane testified, although he had been granted refugee status in Somalia, he also feared persecution there. This was because Somalia was overcrowded resulting in animosity towards people coming into the country. He testified he had last communicated with his family in 1983. He believed his father and mother and some of his siblings were in refugee camps in Somalia, near the Ethiopian border.

Dulane explained when he first entered the United States as a student he intended to return to Ethiopia but conditions in the country, including starvation and persecution worsened. In response to the IJ's query as to whether he was leaving Somalia and Ethiopia because of starvation, Dulane testified he feared for his life, he was "fleeing from persecution because of, first, my religion and second, because of the history of my family, and, third, for general purposes because the .. that place is going berserk." Cert.Admin.R. at 213.

The IJ asked Dulane, in the event of a denial of asylum, whether he could afford to pay his own transportation costs so that he might be eligible for voluntary departure in lieu of deportation. Dulane stated he would be able to afford a ticket combining money earned with savings, and that, in the event of deportation, he wished to be sent to England.

The IJ rendered an oral decision. He determined deportability had been established. The IJ noted the discrepancies concerning where Dulane was born, acknowledged Dulane's explanation, and concluded "[i]t appears and the evidence apparently supports his claim that ethnically he is Ethiopian." Cert.Admin.R. at 154. He nevertheless found Dulane had failed to establish a claim for asylum because of persecution or a well-founded fear of persecution if he returned to Ethiopia or Somalia. He found Dulane's fears arose out of general political upheaval which affected the whole population.

The IJ granted Dulane a period of voluntary departure to Somalia until February 15, 1990. In the event that Dulane was unable to establish that he had the means for voluntary departure, the IJ ordered him to be deported to England and, if England refused to accept him, to be deported to Somalia.

Dulane filed a timely appeal with the BIA and retained counsel. On May 24, 1991, his counsel filed an appeal brief. Dulane claimed the IJ erred in failing to request a new report from the State Department, in determining he was not eligible for asylum, and in not withholding deportation.

On July 30, 1991, Dulane's counsel filed a motion to reopen and remand and an application for suspension of deportation. The motion alleged new facts, attached documentation and affidavits, and maintained that a prima facie case of eligibility for suspension of deportation had been made. On February 9, 1993, Dulane himself wrote to the BIA asking for attention to his case since the BIA had taken no action on the July, 1991 motion. On July 20, 1993, Dulane's counsel filed a motion for decision on the motion to reopen and requested the BIA to take administrative notice of the worsened conditions in Ethiopia and Somalia. On the same day, a case coor-

dinator of the BIA responded that the motion would be considered together with the appeal but that, due to the BIA's heavy workload, the date of decision was unpredictable. In October and December 1993, Dulane wrote two further letters requesting a decision.

On January 3, 1994, the BIA dismissed the appeal and denied the motion to reopen. Dulane's counsel filed this petition for review in a timely manner.

## II. *Analysis.*

### A. *Motion to Reopen and Remand.*

■ The Board derives its authority for deciding motions to reopen from INS regulations, 8 C.F.R. § 3.2. The BIA has broad discretion to grant or deny a motion to reopen. *INS v. Doherty,* 502 U.S. 314, 321–23, 112 S.Ct. 719, 724, 116 L.Ed.2d 823 (1992). "We review the denial of a motion to reopen under an abuse of discretion standard." *Turri v. INS,* 997 F.2d 1306, 1311 (10th Cir.1993).

Dulane asked the BIA to reopen his case, and to remand it to the IJ to permit him to apply for suspension of deportation under § 244 of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1). The BIA considered the motion to reopen under the regulatory requirements governing a motion to remand, citing *Rodriguez v. INS,* 841 F.2d 865, 867 (9th Cir.1987). "Motions to reopen in deportation proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing...." 8 C.F.R. § 3.2 (1994). "Motions to reopen shall state the new facts to be proved at the reopened hearing and shall be supported by affidavits or other evidentiary material." *Id.* § 3.8(a).

There are three independent grounds upon which a motion to reopen may be denied. *INS v. Abudu,* 485 U.S. 94, 104–05, 108 S.Ct. 904, 911–12, 99 L.Ed.2d 90 (1988). First, the BIA may find the alien has failed to establish a prima facie case for the underlying substantive relief. Second, the BIA may conclude that the alien has failed to present previously unavailable, material evidence. Third, where the alien is requesting discretionary relief, such as suspension of deportation, "the BIA may leap ahead, as it were, over the two threshold concerns (prima facie case and new evidence/reasonable explanation), and simply determine that even if they were met, the [alien] would not be entitled to the discretionary grant of relief." *Contreras–Canche v. INS,* No. 93–9553, 1994 WL 325417, at *3 (10th Cir. July 7, 1994).

■ Here, the BIA denied the motion because it found Dulane had failed to establish a prima facie case of eligibility for the relief sought, i.e. suspension of deportation. In order to establish such eligibility, an alien must prove he has been physically present in the United States for a continuous period of at least seven years and has been of good moral character during that time. In addition, he must prove his deportation would result in extreme hardship to himself or to his United States citizen or lawful permanent resident spouse, children or parents. Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1).

■ The BIA denied the motion to reopen because it determined Dulane had failed to satisfy the "extreme hardship" requirement. We review the Board's determination on "extreme hardship" under the abuse of discretion standard, allowing only limited room for substantive review. *Panrit v. INS,* 19 F.3d 544, 545 (10th Cir.1994); *Turri,* 997 F.2d at 1308. "Nonetheless, 'we may still scrutinize the [Board's] decision for procedural regularity.'" *Turri,* 997 F.2d at 1309 (quoting *Hernandez–Cordero v. United States INS,* 819 F.2d 558, 563 (5th Cir.1987) (en banc)).

■ Procedural regularity requires that the Board "*actually consider* all factors relevant to a particular alien's claim of hardship." *Id.* at 1309. The Board is not required " 'to write an exegesis on every contention.' " *Becerra–Jimenez v. INS,* 829 F.2d 996, 1000 (10th Cir.1987) (quoting *Osuchukwu v. INS,* 744 F.2d 1136, 1142 (5th Cir.1984). However, it "must articulate its reasons for denying relief sufficiently for us, as the reviewing court, to be able to see that the Board considered all the relevant factors." *Turri,* 997 F.2d at 1309.

Our reasoning in *Turri* has application here. There, the petitioner sought review of two decisions of the BIA. The first found Turri deportable and denied her request for suspension of deportation pursuant to 8 U.S.C. § 1254(a)(1) on the ground that she failed to establish she would suffer "extreme hardship" if deported. The second decision denied Turri's motions to reopen the proceedings and to reconsider her request for suspension of deportation.

In denying the application for suspension, the BIA recited a "laundry list" of relevant factors, stated it had carefully reviewed the record and " 'concluded that all of the factors presented, considered in their entirety, do not constitute extreme hardship within the meaning of the Act.' " *Id.* at 1309 (quoting the BIA's opinion). We held this constituted insufficient articulation of the Board's reasoning to enable us to perform our review because such reasoning " 'free[d] the Board of the obligation to articulate a reasoned basis for its decisions, eliminating any guaranty of rationality and foreclosing meaningful review for abuse of discretion.' " *d.* at 1310 (quoting *Santana–Figueroa v. INS,* 644 F.2d 1354, 1357 (9th Cir.1981). Because we considered the BIA had not articulated its reasons for denying Turri's request for suspension "sufficiently for us to see that it actually considered all the evidence relevant to petitioner's claim of extreme hardship," we reversed the Board's decision and remanded for further consideration. *Id.* at 1311.

The BIA's denial of the motion to reopen in *Turri* was based on its ruling that "the new evidence, when considered in conjunction with the evidence previously introduced, did not establish a prima facie case of eligibility for suspension of deportation." *Id.* We also reversed and remanded on the motion to reopen because we determined the Board had not considered all the evidence cumulatively. *Id.* at 1311–12.

In the petition before us, the BIA articulated its reasons for denying relief as follows:

While the respondent alleges that he fears persecution if he were to be deported to Ethiopia or Somalia, his comments are entirely speculative in nature. Moreover, we note that while political or economic conditions in an alien's homeland are relevant factors in determining extreme hardship under section 244(a)(1), they do not justify a grant of relief unless other factors such as advanced age, severe illness, family ties, etc. combine with economic detriment to make deportation extremely hard on the alien. *See Matter of Anderson,* 16 I & N Dec. 596 (BIA 1978). The respondent who is single and has no family in the United States, has not spent such a long period of time in this country that he will be unfamiliar with his own culture and should have no greater difficulty than would any other alien returning after a similar period abroad. *See Matter of Chumpitazi,* 16 I & N Dec. 629 (BIA 1978). He has not shown any unusual community ties in the United States. He is young and apparently in good health. Thus, we find that the respondent has failed to demonstrate his prima facie eligibility for suspension of deportation. Reopening of these proceedings is therefore not warranted.

Cert.Admin.R. at 5.

█ The BIA's articulation of the basis for its denial gives no indication that it actually considered all the relevant evidence introduced by Dulane before the IJ and in the motion to reopen. In particular, we cannot glean from the Board's decision that it took into account any of the significant evidence attached to the motion to reopen. This includes an affidavit by Ahmed Bahdon, a long-time family friend, explaining Dulane's father's position in relation to the Ethiopian government, as a leader of the Ogaden secessionist movement. Also attached is an affidavit of Dulane outlining facts which he had learned since the hearing before the IJ from a friend who immigrated to Canada. The affidavit alludes to the fact that three of Dulane's brothers are presently in prison in Addis Ababa undergoing daily torture because they were suspected of aiding their father's escape and refuse to reveal the whereabouts of their father's family.

Also introduced in the motion to reopen are *Amnesty International Report 1991,* detailing political persecutions and extrajudicial executions of persons suspected by the Ethiopian and Somalian governments of collabo-

rating with opposition factions. In addition Dulane introduced the Department of State's *Country Reports on Human Rights Practices for 1990* on Ethiopia and Somalia confirming arbitrary arrests and abuse and torture of detainees suspected of affiliation with opposition groups or harboring anti-government sentiments. The reports also mention that illegal emigration remains punishable in Ethiopia by imprisonment and, in some cases, death.

In *Turri,* we stated: "After the Board fully considers all the evidence previously introduced, it should reevaluate the combined effect of the new evidence and the previous evidence on petitioner's claim of extreme hardship." 997 F.2d at 1311. Based upon our review of the record, we determine the BIA did not announce its decision in terms sufficient for us to conclude that it cumulatively considered all the relevant evidence on extreme hardship. In so doing, the Board abused its discretion. Accordingly, we reverse the BIA's decision with regard to the motion to reopen and remand for further consideration.

### B. *Appeal on Denial of Asylum and Withholding of Deportation.*

#### 1. *Jurisdiction.*

■ The INS argues Dulane only presented a claim for suspension of deportation in his motion to reopen and therefore we have no jurisdiction to review the BIA's decision with regard to the asylum claim. We disagree.

The INS relies on *Nguyen v. INS,* 991 F.2d 621, 623 n. 3 (10th Cir.1993). There, the petitioner sought review of the BIA's upholding of a deportation order. In his opening brief, he alluded to an allegation that his counsel failed to provide him with effective assistance. We refused to address that issue because the petitioner had not raised it on appeal to the BIA.

In *Nguyen,* we relied on *Rivera–Zurita v. INS,* 946 F.2d 118, 120 n. 2 (10th Cir.1991) where we held that failing to raise a question

on appeal to the BIA constitutes failure to exhaust administrative remedies and deprives the reviewing court of jurisdiction to address that issue. In *Rivera–Zurita,* the IJ held, since petitioner had been incarcerated for 180 days or longer, he was precluded from establishing good moral character and was therefore ineligible for suspension of deportation and voluntary departure. The BIA affirmed. In his appeal to this court, petitioner claimed the BIA had abused its discretion by not considering the personal hardship to him that would result from deportation. We would not entertain this proposition which had not been made in the appeal before the Board.

In both *Nguyen* and *Rivera–Zurita,* we refused to consider arguments which had not been raised before nor ruled upon by the BIA. Here, however, the IJ and the BIA ruled on both the issues of eligibility of asylum and withholding of deportation. "[A]ll determinations made during and incident to the administrative proceeding conducted by a special inquiry officer, and reviewable together by the Board of Immigration Appeals ... are likewise included within the ambit of the exclusive jurisdiction of the Courts of Appeals under § 106(a)." [8] *Foti v. INS,* 375 U.S. 217, 229, 84 S.Ct. 306, 314, 11 L.Ed.2d 281 (1963). Accordingly, we have jurisdiction to review the BIA's decision with regard to the asylum claim.

#### 2. *Asylum.*

■ When reviewing the Board's decision on an application for asylum, we apply a substantial evidence standard to the first step of the analysis, at which the Board determines whether the alien has established his or her status as a "refugee." *Castaneda v. INS,* 23 F.3d 1576, 1578 (10th Cir.1994). "The BIA's determination that [the alien] was not eligible for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *INS v. Elias–Zacarias,* 502 U.S. 478, 480–81, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (quoting 8 U.S.C. 1105a(a)(4)).[9] At the second step of the asy-

---

8. Section 106(a) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a).

9. We reject Dulane's contention that this issue is to be reviewed de novo.

lum analysis—where the alien must show that circumstances warrant a favorable exercise of discretion—we review the Board's decision whether to grant asylum under an abuse of discretion standard. *Castaneda,* 23 F.3d at 1578.

■ The BIA found Dulane was ineligible for asylum because he had failed to establish his nationality. The Board stated Dulane had "at different times during his deportation proceedings ... made a claim of nationality from two countries, Ethiopia and Somalia." Cert.Admin.R. at 3. The Board noted the IJ had not determined whether Dulane was a national of either country, although it acknowledged the IJ's statement that "the evidence apparently supports [the respondent's] claim that ethnically he is Ethiopian." *Id.* n. 2 (quoting the I.J.'s decision at 13).

The BIA then opined:

Prior to evaluating a specific claim of persecution, the respondent must establish his nationality so that an immigration judge can then proceed to adjudicate the claim. We do not countenance the practice of an alien claiming to be a national of one country then after the application is submitted to the Department of State and proceedings are begun, switching his claim to another country. We do not approve of this manipulation of the asylum procedures before immigration judges....

In the present case, it appears to us that the respondent has changed the designation of his country of citizenship in an effort to expand his opportunities for asylum and withholding of deportation.

Cert.Admin.R. at 3. In holding that Dulane was not eligible for asylum because he had not established his nationality, the BIA ignored the statute, the record of proceedings, and fundamental due process.

■ The Attorney General has discretion to grant asylum to an otherwise deportable alien who qualifies as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A). A grant of asylum requires two steps. Initially the alien must establish he or she qualifies as a refugee. Once the alien shows he or she qualifies for refugee status, in step two, he or she must show that circumstances warrant a favorable exercise of discretion. *Kapcia v. INS,* 944 F.2d 702, 706–08 (10th Cir.1991).

The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

8 U.S.C. § 1101(a)(42)(A).

Not surprisingly, the BIA cited no authority for its determination that an alien "must establish his nationality so that an immigration judge can then proceed to adjudicate the claim." Cert.Admin.R. at 3. Nowhere in the statute nor in related decisions is there such requirement. To the contrary, the Immigration and Nationality Act includes in the definition of "refugee," "a person having no nationality." 8 U.S.C. § 1101(a)(42)(A).

As the Board noted, "[t]he immigration judge considered the respondent's claims of persecution if returned to either Ethiopia or Somalia without determining whether the respondent had established that he was a national of any one of these countries." Cert.Admin.R. at 3. The IJ, correctly, did not make this a decisive issue in determining whether Dulane qualified as a refugee. The IJ noted:

The Court is somewhat confused in the instant case because of the discrepancies as to where the respondent was born. It appears and the evidence apparently supports his claim that ethnically he is Ethiopian. It is noted that in his application that he has submitted on several occasions he has stated birth in Somalia. His explanation is that he was told by an employee of the Immigration Service when he first applied for relief that he had to put what his passport information contained and he had bought his passport so he continued with it.

(Cert.Admin.R. at 154.)

It is apparent from the record that Dulane's nationality is by no means clear. The

IJ, in finding Dulane to be deportable, and in ordering his deportation to Somalia, apparently accepted the INS' allegation in its Order to Show Cause, *id.* at 273, that Dulane was a citizen of Somalia, at least for the purposes of deportation proceedings. The INS did not brief the issue of nationality either in response to the appeal to the BIA or to Dulane's motion to reopen.

The BIA, however, chose to regard the ambivalence in the evidence as to Dulane's nationality as fatal to his application for asylum, regarding it as "manipulation of the asylum procedures before immigration judges." *Id.* at 3. In making this implied adverse credibility finding, the BIA, contrary to the norm, gave no weight to the IJ's favorable comments on Dulane's credibility. *See Estrada v. INS,* 775 F.2d 1018, 1021 (9th Cir.1985) (holding "[b]cause the immigration judge is in the best position to evaluate an alien's testimony, his or her credibility determinations are to be given 'much weight.'") Although the IJ did not make any specific finding on credibility, he used the term "candidly testified," Cert.Admin.R. at 145, and "candidly stated," *id.* at 154, to describe Dulane's testimony.

If the BIA was to make any inference, it should have done so on known facts. Dulane testified he was born in Ethiopia and fled to Somalia. The National Refugee Commission document submitted certifies that Dulane "is a refugee from Ogaden land, born at Warder, had [sic.] been registered at National Refugee Commission, Counselling Office in Somalia." *Id.* at 259. He purchased a Somalian passport on the black market which stated his place of birth as Mogadishu, Somalia. He listed his birth place accordingly on the INS request for asylum forms, having been advised to do so by an INS official. He argued at the hearing and again in his motion to reopen and appeal that he would suffer hardship if deported to either Somalia or Ethiopia.

In inferring from these facts that Dulane was manipulating the system by "switching his claim" of nationality between Somalia and Ethiopia "to expand his opportunities for asylum," the BIA introduced a non-existent requirement that an alien have a single na-

tionality to qualify for asylum and penalized Dulane for being of uncertain nationality.

"Nationality" is nowhere defined in the Immigration and Nationality Act. As has been noted:

The basic terms of nationality law are matters of common knowledge and understanding. Yet to a surprising extent they are difficult to define. We know that nationality and citizenship are legal and political terms, denoting a status which confers important rights and responsibilities. We know also that this status is established in certain ways. But efforts at precise definition often are frustrating.

4 Charles Gordon & Stanley Mailman, *Immigration Law and Procedure* § 91.01[3][a] (1994). *See also* Siegfried Wiessner, *Blessed be the Ties that Bind: The Nexus between Nationality and Territory,* 56 Miss.L.J. 447 (1986) (discussing the controversial nature of nationality as a legal concept).

Black's Law dictionary defines "nationality" as "[t]hat quality or character which arises from the fact of a person's belonging to a nation or state. Nationality determines the political *status* of the individual, especially with reference to allegiance; while domicile determines his civil *status*. Nationality arises either by birth or by naturalization." *Black's Law Dictionary* 1025 (6th ed. 1990).

It is therefore eminently reasonable that a nomad from the Ogaden ostensibly in Ethiopia, who has fled to Somalia, might be confused as to whether Somalia or Ethiopia was his country of nationality. This is especially true since the Ogaden, the eastern most area of Ethiopia, bordering on Somalia, was the subject of an extended war between the two countries and the people of the Ogaden are considered to be of Somali heritage.

[T]he border between Ethiopia and Somalia was defined by a loose agreement established between 1897 and 1908 among Italy, Great Britain, and Ethiopia. The United Nations redefined the boundary in 1950. In the past three decades, Ethiopia has experienced more disputes with Somalia regarding their mutual boundary than it has with any of its other neighbors. Somalia's belief in the concept of greater

Somalia—one nation for all people of Somali heritage who live on the Horn of Africa (*including the Ogaden region of Eastern Ethiopia*)—has been one of the motives behind the continuous border conflicts.

Daniel Abebe, *Ethiopia ... in Pictures* 9 (1988) (emphasis added). *See also United States v. Dagnechew*, 808 F.Supp. 1517, 1518 n. 1 (D.Colo.1992) (describing the war in the border region between Ethiopia and Somalia); Jane Kurtz, *Ethiopia The Roof of Africa* 26 (1991) (noting "[t]he hunters and gatherers on the plains, who still live like their earliest ancestors, don't have any concept of being part of a nation.")

Who can state Dulane's nationality with certainty? Possibly he has dual nationality, i.e. both Ethiopian and Somalian.[10] More likely, Dulane is "stateless," a condition which a person becomes "most often by expulsion or flight from his native country, or by change of national sovereignty, which has made him a stateless refugee." Gordon & Mailman, *supra*, § 91.01[3][e].

Although the Act makes provision in the definition of "refugee" for one of uncertain nationality, the BIA spotlighted Dulane's failure to establish a single clear nationality, as the reason to deny his application for asylum and suspension of deportation. The BIA effectively punished Dulane because of his misfortune of birth in one country from which he had to flee and because he does not appear to have recognized rights in any other country.[11]

Because the BIA began and ended its inquiry with the question of Dulane's nationality, a non-requirement for establishing refugee status, it did not reach the actual statutory requirements for establishing refugee status. Initially the asylum applicant must prove specific facts showing "either past 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or politi-

cal opinion.'" *Kapcia* 944 F.2d at 706 (quoting 8 U.S.C. § 1101(a)(42)(A)).

Based on our review of the record, we conclude the BIA failed to address whether Dulane established a well founded fear of future persecution if he returns to Ethiopia or Somalia. We cannot therefore say that the BIA's denial of asylum was based on substantial evidence. Accordingly, we reverse the decision of the BIA dismissing Dulane's appeal regarding the denial of his asylum claim and remand the cause to the BIA for further proceedings.

### 3. *Suspension of Deportation.*

When reviewing the Board's ruling on an application for suspension of deportation, we apply a substantial evidence standard to its factual determinations as to whether the alien has established seven years' continuous residence in the United States and good moral character. *Turri*, 997 F.2d at 1308. The final determination as to whether deportation would result in extreme hardship—"is a discretionary matter that we review only for abuse of discretion." *Id.* "So long as the Board considers all the relevant factors [concerning extreme hardship], this court cannot second-guess the weight, if any, to be given any factor. Nonetheless, 'we may still scrutinize the [Board's] decision for procedural regularity.'" *Id.* at 1308–09 (quoting *Hernandez–Cordero* 819 F.2d at 563) (further citation omitted). "Failure to actually consider all the relevant factors constitutes an abuse of discretion." *Id.* at 1309.

The Board held Dulane was ineligible "for withholding of deportation because he has failed, at a minimum, to establish his nationality upon which to evaluate any claim of persecution if returned to the country of nationality." Cert.Admin.R. at 3. Just as the Board falsely injected proof of nationality as a requirement for establishing refugee status, so it did so in relation to the issue of suspension of deportation.

---

10. "Since the municipal laws of different nations do not coincide, it often happens that a person may acquire two or more nationalities, either at the time of his birth or through subsequent action of himself or others." Gordon & Mailman, *supra*, § 91.01[3][d].

11. *See* Hannah Arendt, *The Origins of Totalitarianism* 269–302 (1973) (recognizing the dangers of treating as *indesirables*, refugees who have lost nationally guaranteed rights).

The Board only considered whether Dulane had satisfied the true requirements for suspension of deportation in its consideration of the motion to reopen. There it found, assuming Dulane had demonstrated seven years continuous residence in the United States, he had not established a prima facie case of "extreme hardship" within the meaning of § 244(a)(1) of the Immigration and Nationality Act.

We have already determined, in our discussion regarding the motion to reopen, the BIA's decision does not reflect it actually considered all relevant factors on the issue of extreme hardship and this constitutes an abuse of the Board's discretion. *See Turri,* 997 F.2d at 1309. Accordingly, we reverse the BIA's decision to deny Dulane's appeal regarding suspension of deportation and remand for further consideration.

### C. *Grant of Voluntary Departure.*

In the opening brief of Dulane's petition for review, he requests us, in the alternative, to reinstate the period of voluntary departure granted to him in his deportation proceedings.[12] Dulane relied on *Contreras–Aragon v. INS,* 852 F.2d 1088, 1092 (9th Cir. 1988) (en banc) in which the court found it had jurisdiction to review an administrative grant of voluntary departure pursuant to a judicial appeal. However, in *Castaneda v. INS,* 23 F.3d 1576, 1578–83 (10th Cir.1994), we rejected the decision in *Contreras–Aragon* and found we lacked jurisdiction to reinstate an administrative grant of voluntary departure. Recognizing this, in his reply brief, Dulane requested a ruling on the issue of voluntary departure should await the decision of this court on a petition for rehearing. The awaited decision, *Castaneda v. INS,* 33 F.3d 44, 45 (10th Cir.1994), denied the petition for rehearing, affirming its rejection of the Ninth Circuit's decision in *Contreras–Aragon.* Because we lack jurisdiction, we decline to rule on the issue of extending or reinstating the period of voluntary departure.

### III. *Conclusion.*

The decision of the Board of Immigration Appeals dismissing Dulane's motion to reopen and appeal is REVERSED and the cause is REMANDED for further proceedings in accordance with this ruling. We decline to rule on the issue of reinstatement of the period of voluntary departure.

---

**12.** The BIA ordered: "Pursuant to the immigration judge's order and in accordance with our decision in *Matter of Chouliaris,* 16 I & N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondent shall be deported as provided in the immigration judge's order." Cert.Admin.R. at 5.