67 F.3d 301
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Robert RAMOS-PATINO, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 94-3903.
 United States Court of Appeals, Seventh Circuit.
 Argued Aug. 2, 1995.
Decided Sept. 20, 1995.
 
 Before BAUER, COFFEY and MANION, Circuit Judges.
 
 ORDER
 
 1
 Robert Ramos-Patino petitions for review of an order of the Board of Immigration Appeals (BIA) denying his application for suspension of deportation and voluntary deportation. Ramos is a thirty-two-year-old native and citizen of Mexico who has been living in the United States for roughly the past fourteen years. When Ramos entered the United States in May, 1979, he did so without inspection and in violation of 8 U.S.C. Sec. 1251(a)(2). On April 18, 1990, the Immigration and Naturalization Service ("INS") commenced deportation proceedings. At deportation hearings on September 20, 1990 and April 5, 1991, Ramos offered testimony as to his moral character and the hardship that deportation would cause him and his family. The Immigration Judge ("IJ") issued a decision on May 16, 1991 denying Ramos' application for suspension of deportation and request for voluntary departure. Three and one-half years later, on November 16, 1994, the BIA dismissed Ramos' appeal. We grant the petition for review and remand for further consideration.
 
 I. Facts
 
 2
 At the time of the deportation hearings, Ramos had two U.S.-born children. Ramos testified and explained his family relationships and the hardship he would face if deported. Ramos was not married to the children's mother, Martha Castaneda, due to their stated desire to travel to Mexico so that Martha's and his mothers could attend the wedding. He has subsequently married Martha and they have a third child. Ramos is the primary source of income for his family, though his wife does take in work as a child-care provider. Ramos testified that he has been employed since October 1982, first at a Chicago restaurant as a dishwasher and cook (October 1982-February 1985) and then as a color matcher with a Chicago company (June 1985-present). In 1985 and 1986, Ramos also supplemented his income through weekend work as a street vendor.
 
 
 3
 Ramos' father, a brother, and two sisters live in California and his sister, Marcela Ramos de Rodriguez, lives in the same building as Ramos in Chicago.[1] Ramos' mother and two sisters live in Mexico. His father is a seasonal agricultural worker who visits both Ramos in Chicago and Ramos' mother in Mexico during the off-season. Ramos stated that his father sends money to support his mother and sisters in Mexico and believes that if he was deported his father would have to support him as well because of the difficulty in finding employment in Mexico. Ramos testified that he had a very close relationship with his family, particularly his wife, daughters, father and sister Marcela, and that it would be very difficult and sad for him to leave them. Ms. Rodriguez also testified that Ramos was devoted to her and had a loving and affectionate relationship with his wife and daughters.
 
 
 4
 But there were other factors presented at the hearing. In February 1985, Ramos was arrested for aggravated battery and on August 29, 1986 convicted and sentenced to one year of probation for the offense. At the deportation hearing, Ramos testified that the incident leading to his arrest occurred when he was walking with a friend and his friend was attacked. When Ramos tried to pull the man off of his friend, he was kicked in the head and began bleeding. He pulled out a knife that he carried and apparently struck the attacker, though Ramos did not remember how he injured the man. After Ramos struck the man, he threw down the knife and went to a nearby apartment where he was then arrested. Ramos testified that he had used the knife in order to defend himself and that he had never used the knife prior to the incident.
 
 
 5
 In September 1987, Ramos was arrested for possession of a firearm. Ramos testified that on this occasion he had been at a shooting range and was driving to a family gathering. He was stopped by the police because of expired license plates when the police found the gun. According to Ramos, a friend had purchased the gun, a .357 Magnum, because he could not obtain a license due to his 1985 aggravated battery conviction. Ramos testified he got the gun because he liked the sound and that he only used the gun at the shooting range, though (paradoxically) he knew the gun's caliber was too high to be used at the gun range. Upon pleading guilty, Ramos was convicted on October 19, 1988 of unlawful use of a weapon by a felon and sentenced to two years of probation and seven weeks of periodic imprisonment. At the deportation hearing, Ramos testified that he no longer carried or owned any type of weapon and would not commit any kind of offense involving a weapon.
 
 
 6
 The IJ denied Ramos' application for suspension of deportation and request for voluntary departure, finding that he was not of good moral character and had failed to show extreme hardship would result were he to be deported. The BIA dismissed Ramos' appeal, adopting the reasoning of the IJ, and Ramos now petitions this court for review of the BIA's decision.
 
 II. Analysis
 
 7
 In order to establish eligibility for suspension of deportation an alien must establish that he has been physically present in the United States for a continuous period of at least seven years. He also must show that he is of good moral character, and that deportation would result in extreme hardship to himself or a spouse, parent or child who is a United States citizen or lawful permanent resident. 8 U.S.C. Sec. 1254(a)(1); Hernandez-Patino v. INS, 831 F.2d 750, 752 (7th Cir.1987). "The burden is on the alien to establish both statutory eligibility and equities meriting favorable exercise of discretion vested in the Attorney General." Hernandez-Patino, 831 F.2d at 752. The BIA's factual determinations of whether a petitioner has established seven years continuous residency and good moral character is reviewed under a substantial evidence standard and the BIA's determination of whether a petitioner has demonstrated extreme hardship is reviewed for an abuse of discretion. Dulane v. INS, 46 F.3d 988, 999 (10th Cir.1995); Hernandez-Cordero v. INS, 819 F.2d 558, 560 (5th Cir.1987).
 
 
 8
 The BIA in its review of the IJ's opinion must "consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought, not merely reacted." Palmer, 4 F.3d at 489 (citations omitted). "Although we have urged the BIA 'to explain its decisions in greater detail so that we may be confident it has given an appeal due consideration,' we have held that the BIA adequately explains its decision when it adopts a decision of the IJ." Cuevas v. INS, 43 F.3d 1167, 1170 (7th Cir.1995) (quoting Castaneda-Suarez v. INS, 993 F.2d 142, 146 (7th Cir.1993)). If the BIA adopts the reasoning of the IJ, the court's review is based upon the IJ's analysis and the court will not independently review the record in order to uphold the BIA's decision. Cuevas, 43 F.3d at 1170. Here, the BIA dismissed Ramos' appeal by adopting the decision of the IJ and the court's review is based on the IJ's decision.
 
 
 9
 Section 1254(a)(1) provides that an alien is eligible for a suspension of deportation if he "has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character." 8 U.S.C. Sec. 1254(a)(1). The IJ ruled that: "Based upon the nature and recency of the respondent's convictions the Court finds that [Ramos] has not been a person of good moral character for the seven years preceding his application for suspension of deportation." (Supp.R. at 43) Ramos does not contest the use of the 1987 aggravated battery and 1988 possession of a firearm convictions to establish a lack of good moral character, but maintains the IJ erred by placing inordinate weight on the convictions given his role as assisting a friend in the 1987 conviction and the non-violent nature of the 1988 conviction and by placing insufficient weight on his strong employment history, commitment to providing for his family, and the testimony and written attestations by family, friends, and employers as to his good moral character. Ramos also argues that the three and one-half year interval between the IJ's and BIA's decisions diminished the significance of the convictions and the BIA's decision was deficient because of its failure to discuss the impact of this time lapse.
 
 
 10
 Ramos has a valid point. While this court will not reweigh the relative significance that the BIA places on a particular factor, the BIA's opinion must demonstrate that it reflected on the balance of both favorable and unfavorable factors in denying discretionary relief. Palmer, 4 F.3d at 489; Cortes-Castillo v. INS, 997 F.2d 1199, 1203 (7th Cir.1993). The BIA is obliged "to consider all relevant facts in making its determination ... in the aggregate, not in isolation." Hernandez-Patino, 831 F.2d at 752 (citations omitted). See also Bueno-Carrillo v. Landon, 682 F.2d 143, 146 n. 3 (7th Cir.1982). Here, a factor that the IJ placed a great deal of weight upon (the recency of the convictions) obviously changed during the BIA's delay in deciding Ramos' appeal. It was during the three and one-half year time lapse that the relative significance and weight of the negative factors (the convictions) could have shifted in relation to the positive factors (employment, providing for family, etc.). This shift merited independent discussion by the BIA, especially since the IJ underscored the "recency" of the relatively minor convictions.
 
 
 11
 It is important to note that in the context of an adoption the reasons given by the BIA are those given by the IJ, which here, while perhaps sufficient at the time of the IJ's opinion, were no longer sufficient given the three and one-half-year lapse. The IJ issued his decision on May 16, 1991 (five years after Ramos' conviction for aggravated battery and three and one-half years after Ramos' conviction for possession of a firearm) at a time when the convictions were indeed recent and their recency supported a finding that Ramos lacked good moral character. For some reason not apparent here the BIA did not issue its perfunctory decision until November 16, 1994 (eight years after Ramos' conviction for aggravated battery and six years after his conviction for possession of a firearm). At that time the convictions were obviously less "recent." We cannot accept the BIA's failure to discuss this important fact (the passage of time) given the time-oriented nature of the IJ's opinion; the Board should have re-examined the equities as of the date of its determination and explained its reasoning.[2] See Cortes-Castillo, 997 F.2d at 1203 (BIA decision adopting IJ's opinion deficient when issued five years after the IJ hearing where the IJ emphasized alien's lack of employment in determining that he was not rehabilitated and therefore ineligible for relief from deportation and alien presented evidence of employment when he appealed to the BIA). See cf. Avelar-Cruz v. INS, 58 F.3d 338, 340 (7th Cir.1995) (alien's accumulation of seven years unrelinquished domicile during pendency of appeal in front of BIA entitled alien to relief from deportation); Cipriano v. INS, 24 F.3d 763, 764-65 (5th Cir.1994) (BIA should look back from the date of its decision rather that the date of an alien's original application for suspension of deportation in order to determine whether a prior incarceration which would statutorily preclude a finding of good moral character fell within the statutory time period).
 
 
 12
 Nor can we accept the BIA's decision with regard to Ramos' claims of extreme hardship. Section 1254(a)(1) provides that an alien is eligible for a suspension of deportation if his deportation would "result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. Sec. 1254(a)(1). Ramos argues that his deportation would create emotional hardships for himself, his citizen children, and his relatives that are lawful permanent residents and would result in economic detriment to himself, his citizen children, and his father whom Ramos believes would be forced to support him in Mexico because Ramos' lack of formal education and the economic conditions in Mexico would make it difficult for Ramos to find work. The IJ found that Ramos' allegations of economic and emotional hardship did not amount to extreme hardship. The IJ held that Ramos' "children are still young, with neither child having yet entered grammar school. As such neither has yet become accustomed to life in the United States and, therefore, should not encounter culture shock and an inability to assimilate into Mexican culture." That may well have been the situation when the IJ heard the case, but was it so three and one-half years later when the Board summarily ruled?
 
 
 13
 "When the potential hardships the alien may encounter are the same faced by any alien to be deported, the 'extreme hardship' standard has not been met." Cortes-Castillo, 997 F.2d at 1204. See also Marquez-Medina v. INS, 765 F.2d 673, 677 (7th Cir.1985): Hernandez-Patino, 831 at 754-55. This general principle may hold true for many of Ramos' personal claims of extreme hardship. But given the ground upon which the IJ rested his opinion for Ramos' claims regarding the extreme hardship for his daughters, the picture has obviously changed. The IJ held that Ramos' deportation would not create extreme hardship for his citizen two- and five-year-old daughters because they had not yet entered gammer school and could easily assimilate into the Mexican culture. At the time of the BIA's decision, however, Ramos' daughters were three and one-half years older (nine and five years old) and at least one daughter had begun grammar school. This fact was obvious; children get older, begin school, and with each year they become more and more inculcated to American culture. "A decision that does not reflect ... consideration of important aspects of an individual's claim is one made, for all a reviewing court can know, 'without rational explanation.' " Espinoza v. INS, 991 F.2d 1294, 1301 (7th Cir.1993) (citations omitted). We believe that the BIA's failure to explain its decision in light of the daughters' ages, given the time-contingent nature of the IJ's opinion, does not fulfill its obligation to exercise its discretion in a "reasoned manner" and amounted to an abuse of discretion.
 
 
 14
 Finally, since the 1991 deportation hearing several things have changed that could bear on Ramos' eligibility for suspension of deportation or voluntary departure: (1) Ramos married the mother of his children; (2) Ramos' wife gave birth to a third child; (3) Ramos' two older daughters began school; (4) Ramos' mother may have relocated to the United States; and (5) during the nine years following the aggravated battery conviction and almost seven years following the conviction for unlawful possession of a firearm Ramos has continued to work, provide for his family, and has not had any further problems with the law enforcement. These facts appear relevant both to Ramos' moral character and to his claim of extreme hardship. Such significant changes in circumstances should be considered in an appropriate forum, that forum being before the BIA and IJ, not the Court of Appeals. In order to introduce evidence as to changed circumstances, Ramos must therefore petition the BIA to reopen his case pursuant to 8 C.F.R. Sec. 3.2. See Sivaainkaran v. INS, 972 F.2d 161, 166 (7th Cir.1992).
 
 
 15
 We recognize the difficult position that an alien faces in trying to present new or additional evidence regarding the equities of his case to the BIA. Since delay works in an alien's favor by allowing him to stay in the country, there is little incentive for an alien to petition the BIA to consider additional positive factors in fear of waking a sleeping giant--and this one did snooze for a seemingly inordinate period of time. Nevertheless, this mechanism exists and we are unwilling allow Ramos to bypass this mechanism and require the BIA to consider Ramos' changed circumstances in terms of his marriage, the birth of a third daughter, and his mother's possible relocation without proper introduction by Ramos of these equitable factors to the BIA. Sivaainkaran, 972 F.2d at 166; Kaczmarczyk v. INS, 933 F.2d 588, 597 (7th Cir.), cert. denied, 502 U.S. 981 (1991). As for the passage of time since the convictions and the daughters' ages, the changes in these circumstances between 1991 and the present are (and were) self-evident and we do not believe that an alien is required to petition the BIA to recognize the obvious. These inevitable changes in circumstances were allowed by the BIA's long delay in its summary affirmance of the IJ. On remand the BIA should consider these factors.
 
 III. Conclusion
 
 16
 The petition for review is GRANTED and REMANDED for further consideration of Ramos' application for suspension of deportation and alternative request for voluntary departure.
 
 
 
 [1]
 Ramos' father and his sister are lawful permanent residents. In addition, Ramos has two siblings living in California who are lawfully present and one sibling who is an undocumented alien
 
 
 [2]
 The BIA also denied Ramos' petition for voluntary departure. Section 1254(e) allows an alien to voluntarily depart if he has been "a person of good moral character for at least five years immediately preceding his application for voluntary departure." 8 U.S.C. 1254(e). The IJ denied Ramos' request for voluntary departure, finding that Ramos had not established the requisite good moral character and Ramos answered equivocally when asked about his willingness to depart the United States voluntarily. If the lack of good moral character in the past five years was based on the convictions, six years had lapsed at the time the BIA ruled. Because we believe the BIA must re-examine its determination regarding Ramos' moral character, Ramos' request for voluntary departure must also be re-examined by the BIA